Attorneys for Lehman Brothers Holdings Inc.
and Lehman Brothers Special Financing Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br><br>Debtor. | Chapter 11 Case<br>No. 08-13555 (JMP)<br><br>(Jointly Administered) |
| Lehman Brothers Holdings Inc., in its capacity as Plan Administrator on behalf of Lehman Brothers Special Financing Inc.,<br><br>     Plaintiff,<br><br> v.<br><br>LCOR Alexandria L.L.C.,<br>PTO Holdings LLC, and<br>Does 1-10,<br><br>     Defendants. | Adv. Proc. No. 13-01689 (JMP) |

**NOTICE OF SUBPOENA FOR THE PRODUCTION OF**
**DOCUMENTS FROM NONPARTY BANK OF AMERICA CORPORATION**

        PLEASE TAKE NOTICE that Plaintiff Lehman Brothers Holdings Inc., in its

capacity as Plan Administrator on behalf of Lehman Brothers Special Financing Inc., hereby

files a notice of the attached Subpoena for the Production of Documents, dated May 14, 2014,

and served on Bank of America Corporation.

Dated: May 15, 2014
   New York, New York

       Respectfully submitted,

          ___*/s/ Andrew J. Rossman*___

       Andrew J. Rossman
       QUINN EMANUEL URQUHART & SULLIVAN
       LLP
       51 Madison Avenue, 22nd Floor
       New York, New York 10010
       Telephone: (212) 849-7000
       Facsimile: (212) 849-7100

       Attorneys for Lehman Brothers Holdings Inc.
       and Lehman Brothers Special Financing Inc.

## EXHIBIT A TO SUBPOENA

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, as made applicable to this adversary proceeding by Rule 9016 of the Federal Rules of Bankruptcy Procedure, Plaintiff Lehman Brothers Holdings Inc., in its capacity as Plan Administrator on behalf of Lehman Brothers Special Financing Inc., requests that nonparty Bank of America Corporation serve written responses to these requests for production and produce copies of the documents and things requested below at the law offices of Quinn Emanuel Urquhart & Sullivan LLP, within 30 days after service hereof.

## DEFINITIONS

1.      The Uniform Definitions in Discovery Requests set forth in Local Civil Rules 26.2 and 26.3 shall apply to the information requested herein.

2.      "Agreement" shall mean the 1992 ISDA Master Agreement, including the schedule thereto, dated as of December 13, 2001, entered into between LBSF and LCOR, which is attached as Exhibit 1.

3.      "Bank of America" shall mean Bank of America Corporation and any of its officers, directors, employees, agents, attorneys, assigns, representatives, parents, owners with more than 5% interest, affiliates, direct or indirect subsidiaries, or any person who otherwise acted or is acting on its behalf.

4.      "Communication" and "Communications" shall mean all written, oral, recorded or electronic contacts, including, but not limited to, negotiations, writings, contracts, agreements, orders, invoices, emails, letters, memos, conversations, discussions, notices, statements, recorded telephone calls or voice messages, facsimile, electronic data or information transmission or other means of communication between persons or entities.

5.     "Document(s)" shall mean to include, and is not limited to, originals (and copies that are not identical duplicates of originals) of all writings and electronically stored information of any kind including, without limitation, all papers, correspondence, memoranda, notes, message slips, diaries, letters, telegrams, reports, invoices, checks, statements, time sheets, calendars, photographs, films, objects, recordings (audio and/or video), transcripts of recordings, books, records, communications, accounts, drawings, graphs, charts, and images and all other data or data compilations stored in any medium from which information can be obtained or retrieved, including, but not limited to, electronic, digital, magnetic, CD-ROM, emails, computer storage, or metadata.  The term "metadata" means a set of data that describes and gives information about other data or information about a particular data set which describes how, when and by whom it was collected, created, accessed, or modified and how it is formatted (including data demographics such as size, location, storage requirements and media information).  Metadata includes all of the contextual, processing and use information needed to identify and certify the scope, authenticity and integrity of active and archival electronic information or records (e.g., directory structure or path name), file format or file type, file size, file dates (e.g., creation dates, date of last data modification, date of last data access, and date of last metadata modification), and file permissions (e.g., who can read the data, who can write to it and who can run it).  The electronically stored information which is responsive to any part of this Request calling for metadata shall be produced in its native format.

6.     "LBSF" shall mean Lehman Brothers Special Financing Inc.

7.     "LCOR" shall mean LCOR Alexandria L.L.C. and any of its officers, directors, employees, agents, attorneys, assigns, representatives, advisors including but not limited to Chatham Financial, BW Realty Advisors LLC and CTL Capital, parents, owners with

more than 5% interest, affiliates, direct or indirect subsidiaries, or any person who otherwise

acted or is acting on its behalf, including, without limitation, LCOR PTO Headquarters LLC,

Rosegreen Trust, PTO Holdings LLC and PTO Realty Remainderman LLC.

      8.    "Market Quotation" shall have the meaning ascribed to it in Section 12 of

the Agreement.

      9.    "Plaintiff" shall mean Lehman Brothers Holdings Inc., in its capacity as

Plan Administrator on behalf of Lehman Brothers Special Financing Inc.

      10.    "PTO Holdings" shall mean PTO Holdings LLC and any of its officers,

directors, employees, agents, attorneys, assigns, representatives, parents, owners with more than

5% interest, affiliates, direct or indirect subsidiaries, or any person who otherwise acted or is

acting on its behalf, including, without limitation, Green Lowe GSA LLC, Related GSA

Holdings, LLC, and JMP-PTO Realty LLC.

      11.    "Reference Market-makers" shall have the meaning ascribed to it in

Section 12 of the Agreement.

      12.    "Replacement Transaction" shall mean any transaction entered into or

considered entering into by LCOR to replace, hedge, amend and/or modify the Terminated

Transaction or to hedge any of the risks hedged by the Terminated Transaction.

      13.    "Termination Date" shall mean December 16, 2008.

      14.    "Terminated Transaction" shall mean the transaction memorialized in the

confirmation dated March 30, 2005 that was terminated by LCOR in its letter to LBSF dated

December 9, 2008. *See* attached Exhibits 2 and 3.

## INSTRUCTIONS

1.      The following Instructions apply to each request set forth herein.

2.      These requests for Documents and things are continuing in nature.  If, after producing the requested Documents and things, Bank of America obtains or becomes aware of any further responsive Documents or things, Bank of America must produce to Plaintiff such additional Documents and things.  Such additional Documents and things are to be promptly produced at the offices of Quinn Emanuel Urquhart & Sullivan LLP.

3.      If Bank of America withholds any Document, portion of a Document, or thing responsive to a request herein based on a claim of privilege, work product immunity or for any other reason, Bank of America must provide a log setting forth a statement of the basis for the claim of privilege in accordance with the requirements of Rule 26(b)(5) of the Federal Rules of Civil Procedure and Local Rule 7034-1(c).  The claim of privilege shall identify the following: (1) the nature of the privilege being claimed and, if the privilege is being asserted in connection with a claim or defense governed by state law, the state's privilege rule being invoked; (2) the type of Document; (3) the general subject matter of the Document; (4) the date of the Document; and (5) such other information as is sufficient to identify the Document for a subpoena duces tecum, including, where appropriate, the author of the Document, the addressee of the Document, and, where not apparent, the relationship of the author to the addressee, and the names of all entities that received a copy of the Document.  Bank of America shall serve the privilege log containing all of the information listed above upon Plaintiff within thirty (30) days of the production from which the logged Documents have been excluded.

4.      If Bank of America withholds any Documents or any portion of any Document based on an objection to these requests for production, Bank of America shall state all

grounds for the objection with specificity and shall state whether Bank of America has withheld any Documents or any portion of any Document based on that objection. Any grounds not stated in a timely objection shall be waived.

## RELEVANT TIME PERIOD

Unless otherwise stated, the relevant time period for each of the following requests is from and including September 12, 2008 through the present.

## REQUESTS FOR PRODUCTION

REQUEST NO. 1

All Documents and Communications between and among, or on behalf of, LCOR and Bank of America related to Market Quotations from Reference Market-makers, and/or Replacement Transactions in connection with the Terminated Transaction.

REQUEST NO. 2

All Documents and Communications between and among, or on behalf of, LCOR and Bank of America related to bids sought by LCOR in connection with the Market Quotation process.

REQUEST NO. 3

All Documents and Communications between and among, or on behalf of, Bank of America and any Reference Market-maker related to Market Quotations and/or Replacement Transactions in connection with the Terminated Transaction.

REQUEST NO. 4

All Documents and Communications related to LCOR's termination of the Terminated Transaction.

REQUEST NO. 5

   All Documents and Communications related to valuation of the Terminated

Transaction.

REQUEST NO. 6

   All Documents and Communications reflecting or related to any bids, potential,

prospective or otherwise, formulated by Bank of America in connection with any derivatives

transactions with LCOR that contain similar or identical material economic terms as the

Agreement or Terminated Transaction.


Dated: May 14, 2014
   New York, New York

                _____

            Andrew J. Rossman
            QUINN EMANUEL URQUHART & SULLIVAN
            LLP
            51 Madison Avenue, 22nd Floor
            New York, New York 10010
            Telephone: (212) 849-7000
            Facsimile: (212) 849-7100

            Attorneys for Lehman Brothers Holdings Inc.
            and Lehman Brothers Special Financing Inc.

# Exhibit 1

(Local Currency-Single Jurisdiction)                          Execution Copy

# ISDA®

### International Swaps and Derivatives Association, Inc.

# MASTER AGREEMENT

### dated as of December 13, 2001

Lehman Brothers Special Financing Inc. and LCOR Alexandria L.L.C. have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement (the "Master Agreement"), which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.      **Interpretation**

(a)      *Definitions.*  The terms defined in Section 12 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.*  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)      *Single Agreement.*  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)      *General Conditions.*

(i)      Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)      Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)      Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

(iii)   Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of branches or offices through which the parties make and receive payments or deliveries.

(d)    *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

**3.    Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into) that:—

(a)    ***Basic Representations.***

    (i)    *Status.* It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

- 2 -

(ii)    *Powers*.  It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorize such execution, delivery and performance;

(iii)    *No Violation or Conflict*.  Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)    *Consents*.  All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)    *Obligations Binding*.  Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)    *Absence of Certain Events*.  No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation*.  There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information*.  All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

4.        **Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information*.  It will deliver to the other party any forms, documents or certificates specified in the Schedule or any Confirmation by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorizations*.  It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYK 1115883-3.071370.0011

(c)      *Comply with Laws*.  It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

**5.      Events of Default and Termination Events**

(a)      *Events of Default*.  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:——

(i)      *Failure to Pay or Deliver*.  Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)      *Breach of Agreement*.  Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) or to give notice of a Termination Event) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)      *Credit Support Default*.

(1)      Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)      the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)      the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)      *Misrepresentation*.  A representation made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)      *Default under Specified Transaction*.  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

(vi) *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*.  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

   (1)      is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*.  The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

   (1)      the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYK 1115883-3.071370.0011

(2)    the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    **Termination Events.**  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (ii) below or an Additional Termination Event if the event is specified pursuant to (iii) below:—

(i)    **Illegality.**  Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

(1)    to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)    to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)    **Credit Event Upon Merger.**  If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(iii)    **Additional Termination Event.**  If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    **Event of Default and Illegality.**  If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

6.    **Early Termination**

(a)    **Right to Terminate Following Event of Default.**  If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

- 6 -

petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)     ***Right to Terminate Following Termination Event.***

(i)     ***Notice.*** If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)     ***Two Affected Parties.*** If an Illegality under Section 5(b)(i)(1) occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iii)     ***Right to Terminate.*** If:—

(1) an agreement under Section 6(b)(ii) has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality other than that referred to in Section 6(b)(ii), a Credit Event Upon Merger or an Additional Termination Event occurs,

either party in the case of an Illegality, any Affected Party in the case of an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)     ***Effect of Designation.***

(i)     If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)     Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(d) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)     ***Calculations.***

(i)     ***Statement.*** On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

(ii)    *Payment Date.*   An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event).   Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment), from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate.   Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    *Payments on Early Termination.*   If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss," and a payment method, either the "First Method" or the "Second Method."   If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method," as the case may be, shall apply.   The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.*   If the Early Termination Date results from an Event of Default:—

(1)    *First Method and Market Quotation.*   If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party over (B) the Unpaid Amounts owing to the Defaulting Party.

(2)    *First Method and Loss.*   If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)    *Second Method and Market Quotation.*   If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party less (B) the Unpaid Amounts owing to the Defaulting Party.   If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)    *Second Method and Loss.*   If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement.   If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)    *Termination Events.*   If the Early Termination Date results from a Termination Event:—

(1)    *One Affected Party.*   If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)     *Two Affected Parties.* If there are two Affected Parties:—

(A)     if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Unpaid Amounts owing to X less (II) the Unpaid Amounts owing to Y; and

(B)     if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)   *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)    *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

## 7.     Transfer

Neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)     a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)     a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8.     Miscellaneous

(a)     *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYK 1115883-3.071370.0011

(b)      *Amendments*.   No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)      *Survival of Obligations*.   Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)      *Remedies Cumulative.*   Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)      *Counterparts and Confirmations.*

     (i)      This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

     (ii)      The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise).  A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement.  The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)      *No Waiver of Rights.*   A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)      *Headings*.   The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

## 9.    Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 10.    Notices

(a)      *Effectiveness*.   Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

     (i)      if in writing and delivered in person or by courier, on the date it is delivered;

     (ii)      if sent by telex, on the date the recipient's answerback is received;

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYK 1115883-3.071370.0011

(iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery ) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 11.    Governing Law and Jurisdiction

(a)    *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 12.    Definitions

As used in this Agreement:—

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

- 11 -

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person.  For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

      (a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

      (b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

      (c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

      (d)    in all other cases, the Termination Rate.

*"consent"* includes a consent, approval, action, authorization, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iii).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"law"* includes any treaty, law, rule or regulation and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYK 1115883-3.071370.0011

relevant account is located, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 9. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYK 1115883-3.071370.0011

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Scheduled* Payment *Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

(a)    the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

*"Termination Event"* means an Illegality or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYK 1115883-3.071370.0011

market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate.    Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed.   The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the fair market values reasonably determined by both parties.

NYK 1115883-3.071370.0011

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS SPECIAL
    FINANCING INC.

By: _____

    Name:   T. Courtney Jenkins
    Title:   Vice President
    Date:   12-19-01

LCOR ALEXANDRIA L.L.C.
    By: LCOR Operating Company LLC, its Managing Member
    By: LCOR Public/Private L.L.C., its Managing Member

By: _____

    Name:
    Title:
    Date:

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS SPECIAL
      FINANCING INC.

By: _____

      Name:
      Title:
      Date:

LCOR ALEXANDRIA L.L.C.
By: LCOR Operating Company LLC, its Managing Member
By: LCOR Public/Private L.L.C., its Managing Member

By: _____

      Name:
      Title:
      Date:

SCHEDULE
to the
MASTER AGREEMENT
dated as of December 13, 2001
between
LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A"),
a corporation organized under
the laws of
the State of Delaware
and
LCOR ALEXANDRIA L.L.C. ("Party B"),
a limited liability company of
the State of Delaware

Part 1. **Termination Provisions.**

In this Agreement:—

(a)  *"Specified Entity"* means in relation to Party A for the purpose of:—

| | |
|---|---|
| Section 5(a)(v) (Default under Specified Transaction), | Lehman Brothers Holdings Inc. ("Holdings"). |
| Section 5(a)(vi) (Cross Default), | Holdings. |
| Section 5(a)(vii) (Bankruptcy), | Holdings. |
| Section 5(b)(ii) (Credit Event Upon Merger), | Holdings. |

and in relation to Party B for the purpose of:—

| | |
|---|---|
| Section 5(a)(v) (Default under Specified Transaction), | Not applicable. |
| Section 5(a)(vi) (Cross Default), | Not applicable. |
| Section 5(a)(vii) (Bankruptcy), | Not applicable. |
| Section 5(b)(ii) (Credit Event Upon Merger), | Not applicable. |

(b)  *"Specified Transaction"* will have the meaning specified in Section 12 of this Agreement.

(c)  The *"Cross Default"* provisions of Section 5(a)(vi) will apply to Party A and Party B.

The following provisions apply:—

*"Specified Indebtedness"* will have the meaning specified in Section 12 of this Agreement.

*"Threshold Amount"* means two percent (2%) of the Stockholders' Equity of Holdings, in the case of Party A and Holdings (or its equivalent in any other currency), and USD 10,000,000 in the case of Party B.

(d)  The *"Credit Event Upon Merger"* provisions of Section 5(b)(ii) will apply to Party A and Party B

(e)   The *"Automatic Early Termination"* provisions of Section 6(a) will not apply to either Party A or Party B.

(f)   *Payments on Early Termination.*   For the purpose of Section 6(e) of this Agreement, Market Quotation and the Second Method will apply.

(g)   *Insurer Provisions.*   The following provisions shall apply to any Transaction to which the Interest Rate Swap Insurance Policy issued by MBIA Insurance Corporation ("Insurer"), as insurer with respect to Party B, as principal, and for the benefit of Party A, as beneficiary (the "Swap Insurance Policy"), relates (the "Insured Transactions"):

    (i)   *Designation of Early Termination Date.*   Notwithstanding anything to the contrary in Section 6 of this Agreement, if any:

        (A)   Event of Default in respect of any Insured Transaction occurs; or

        (B)   Termination Event in respect of any Insured Transaction occurs (except a Termination Event under Part 1(g)(iii)(A) or (B) of this Schedule when such event has occurred with respect to Party B as the Affected Party),

    then, in either case, neither Party A nor Party B shall designate an Early Termination Date in respect of any such Insured Transaction unless:

        (X)   Insurer is in conservation, liquidation, receivership or a similar proceeding under the New York Insurance Law;

        (Y)   Insurer has failed to pay any payment due to Party A under the terms and conditions of the Swap Insurance Policy; or

        (Z)   Insurer has otherwise consented in writing to such designation.

    (ii)   *Insurer-directed termination.*   If any Event of Default under Section 5(a) occurs with respect to Party B as the Defaulting Party, then Insurer shall have the right (but not the obligation) upon notice to Party A to designate an Early Termination Date with respect to Party B in the same manner and to the same extent as Party A and with the same effect as if such designation were made by Party A.   For purposes of the foregoing sentence, an Event of Default with respect to Party B shall be considered to be continuing, notwithstanding any payment by Insurer under the Swap Insurance Policy.   The parties acknowledge that unless Insurer designates an Early Termination Date (as opposed to merely consenting to such designation by one of the parties) payments due from Party B because an Early Termination Date has been designated will not be insured.

    (iii)   *Additional Termination Event.*   Additional Termination Event will apply.   The following shall constitute Additional Termination Events:

        (A)   Insurer fails to meet its payment obligations under the Swap Insurance Policy and such failure is continuing with respect to Insurer under the Swap Insurance Policy.

        For the purpose of the foregoing Termination Event, the Affected Party shall be Party B.

NYA 334403.7

(B)    Each of Insurer and XL Capital Assurance Inc. ("Standby Insurer") fails at any time during the term of this Agreement to have (a) a claims-paying ability rating of at least A- or higher from Standard & Poor's Ratings Services, A Division of The McGraw-Hill Companies, Inc. ("S&P") or (b) a financial strength rating of at least A3 or higher from Moody's Investors Service, Inc. ("Moody's"); provided however that additionally:

(X)    an Event of Default has occurred or is continuing with respect to Party B as the Defaulting Party; or

(Y)    a Termination Event has occurred or is continuing with respect to Party B as the Affected Party; or

(Z)    the underlying (shadow) rating of the SAVRS (as defined in the Transaction entered into pursuant to this Agreement in the Confirmation dated the date hereof) is withdrawn, suspended or reduced below BBB by S&P.

For the purpose of the foregoing Termination Event, the Affected Party shall be Party B.

(C)    The rating of the long-term senior unsecured debt of Holdings from (i) S&P is withdrawn, suspended or falls below BBB+ or (b) Moody's is withdrawn, suspended or falls below Baa1.

For the purpose of the foregoing Termination Event, the Affected Party shall be Party A.

(iv)    *No suspension of payments.* Notwithstanding Section 2(a)(iii) of this Agreement, Party A shall not suspend any payments due under an Insured Transaction under Section 2(a)(iii) unless:

(A)    Insurer is in default in respect of any payment obligations under the Swap Insurance Policy; or

(B)    Insurer has not provided Party A, in accordance with the terms of this Agreement, wire instructions for payments required by this Agreement to be provided by Party B to Party A, which notices Party B has failed to provide, and Party A has given three (3) Business Days' notice to Insurer of such failure.

(v)    *Representations and agreements.* Each party agrees that each of its representations and agreements in this Agreement is expressly made to and for the benefit of Insurer.

(vi)    *Third-party beneficiary.* Party A and Party B hereby each acknowledge and agree that Insurer shall be an express third-party beneficiary (and not merely an incidental third-party beneficiary) of this Agreement and the obligations of such party under any Insured Transaction, and as such, entitled to enforce the Agreement and the terms of any such Insured Transaction against such party on its own behalf and otherwise shall be afforded all remedies available hereunder or otherwise afforded by law against the parties hereto to redress any damage or loss incurred by Insurer including, but not limited to, fees (including professional fees), costs and expenses incurred by Insurer which are related to, or resulting from any breach by such party of its obligations hereunder.

3

NYA 334403.7

(vii)  *Policy coverage*.  Party A and Party B hereby each acknowledge and agree that Insurer's obligation with respect to an Insured Transaction shall be limited to the terms of the Swap Insurance Policy.  Notwithstanding Section 2(d) and any other provision of this Agreement, Insurer shall not have any obligation to pay interest on any amount payable by Party B under this Agreement.

(viii)  *Subrogation*.  Party A and Party B hereby acknowledge that to the extent of payments made by Insurer to Party A under the Swap Insurance Policy, Insurer shall be fully subrogated to the rights of Party A against Party B under the Insured Transaction to which such payments relate, including, but not limited to, the right to receive payment from Party B and the enforcement of any remedies.  Party A hereby agrees to assign to Insurer its right to receive payment from Party B under any Insured Transaction to the extent of any payment thereunder by Insurer to Party A. Party B hereby acknowledges and consents to the assignment by Party A to Insurer of any rights and remedies that Party A has under any Insured Transaction or any other document executed in connection herewith.

(ix)  *Isolation of Insured Transactions in designating an Early Termination Date*. Notwithstanding Section 6 of this Agreement, any designation of an Early Termination Date in respect of the Insured Transactions by Insurer or by Party A with the consent of Insurer pursuant to paragraph (i) above shall apply only to the Insured Transactions and not to any other Transaction under this Agreement, unless Party A shall designate an Early Termination Date in respect of such other Transaction. Nothing contained in this paragraph (ix) shall affect the rights of Party A under this Agreement to designate an Early Termination Date in respect of any Transaction other than the Insured Transactions, which designation shall not apply to the Insured Transactions unless expressly provided in such designation and unless Insurer shall have designated, or consented to the designation by Party A of, an Early Termination Date in respect of the Insured Transactions in accordance with paragraph (i) above.

(x)  *No netting*.  Notwithstanding Section 2(c) of this Agreement, in no event shall either Party A or Party B be entitled to net its payment obligations in respect of the Insured Transactions against the payment obligations of the other party in respect of other Transactions under this Agreement if such Transactions are not Insured Transactions, nor may either Party A or Party B net the payment obligations of the other party under Transactions that are not Insured Transactions against the payment obligations of such party under Insured Transactions, it being the intention of the parties that their payment obligations under Insured Transactions be treated separate and apart from all other Transactions. Section 6(e) of this Agreement shall apply to all Insured Transactions with the same effect as if the Insured Transactions constituted a single master agreement.  Notwithstanding Section 6(e) of this Agreement, the amount payable under Section 6(e) of this Agreement upon the termination of any Insured Transaction shall be determined without regard to any Transactions other than the Insured Transactions, it being the intention of the parties that their payment obligations under the Insured Transactions be treated separate and apart from all other Transactions unless otherwise specified in such other Transaction and agreed to in writing by Insurer.

(xi)  *No set-off or counterclaim*.  In no event shall either Party A or Party B be entitled to:

(A)  set-off its payment obligations in respect of an Insured Transaction against the payment obligations of the other party (whether by counterclaim or otherwise) if such obligations are not Insured Transactions, or

4

NYA 334403.7

(B)     net the payment obligations of the other party that are not with respect to Insured Transactions against the payment obligations of such party under Insured Transactions,

it being the intention of the parties that their payment obligations under Insured Transactions be treated separate and apart from all other obligations. Notwithstanding Section 6(e) of this Agreement, the amount payable under Section 6(e) of this Agreement upon the termination of any Insured Transaction shall be determined without regard to any obligation other than those under the Insured Transactions, it being the intention of the parties that their payment obligations under the Insured Transactions be treated separate and apart from all other obligations unless otherwise specified in such other obligation and agreed to in writing by Insurer.

(xii)    *Expenses*.  Party B agrees to reimburse Insurer immediately and unconditionally upon demand for all reasonable expenses incurred by Insurer in connection with the issuance of the Swap Insurance Policy and the enforcement by Insurer of Party B's obligations under this Agreement and any other documents executed in connection with the execution and delivery of this Agreement, including, but not limited to, fees (including professional fees), costs and expenses incurred by Insurer which are related to, or resulting from any breach by Party B of its obligations hereunder.

(xiii)   *Assignments*.  Notwithstanding Section 7 of this Agreement, no Insured Transaction may be assigned by either Party A or Party B without the prior written consent of Insurer.

(xiv)    *Amendments/waivers*.  Section 8(b) of the Agreement is hereby amended by (A) adding the words "or any Credit Support Document" after the word "Agreement" in the first line thereof and (B) adding the phrase "and Insurer" following the word "parties" in the second line thereof.

(xv)     *Notices*.  A copy of each notice or other communication between the parties with respect to this Agreement must be forwarded to Insurer.  For the purposes of Section 10(a) of the Agreement, for each Insured Transaction, a copy of all notices or communications to Party A or Party B shall also be sent to Insurer at:

Address:   MBIA Insurance Corporation
113 King Street
Armonk, New York 10504
Attention: IPM-PFG-East
Facsimile No.: 914 765-3799       Telephone No.: 914 273-4545

(xvi)    *"Reference Market Makers."*  The definition of "Reference Market-makers" set forth in Section 12 of this Agreement shall be amended in its entirety to read as follows:

"Reference Market-makers" means four (4) leading dealers in the relevant swap market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among dealers having an office in the same city.  The rating classification assigned to any outstanding long-term senior debt securities issued by such dealers shall be at least (1) Aa or higher as determined by Moody's, (2) AA

5

or higher as determined by S&P or (3) an equivalent investment grade rating determined by a nationally-recognized rating service acceptable to both parties, provided, however, that, in any case, if Market Quotations cannot be determined by four (4) such dealers, the party making the determination of the Market Quotation may designate, with the consent of the other party and Insurer, one (1) or more leading dealers whose long-term senior debt bears a lower investment grade rating.

(xvii)    *"Bonds"*.  "Bonds" shall mean, the bonds identified as the Bonds on Confirmation relating to Insured Transactions. "Related Bonds" or "related Bonds" shall mean the bonds identified as the Bonds on the Confirmation relating to the Insured Transaction to which such Bonds are said to relate.

(xviii)    *Designation of Early Termination Event in Certain Circumstances.*  Upon the occurrence of an Event of Default or Termination Event in respect of Party A under this Agreement pursuant to which Party B would, but for the operation of Part 1(g)(i) of this Schedule, be entitled to designate an Early Termination Date in respect of one or more Insured Transactions hereunder, Party B may designate an Early Termination Date in respect of such Insured Transactions if (A) the Insurer consents, or (B) Party B is able to (i) provide evidence satisfactory to Insurer that Party B has sufficient available funds to pay the Settlement Amount to be paid by Party B, if any, as a result of such early termination, and (ii) either (x) arrange for the assumption or other replacement of the obligations of Party A hereunder by an entity acceptable to Insurer and on terms mutually acceptable to the parties hereto and Insurer or (y) either convert the Bonds (as defined in the Covered Indenture) to a fixed rate of interest at or below the Fixed Rate set forth in the Confirmation of the Insured Transaction or defease the Bonds (as defined in the Covered Indenture).

(xix)    *Agreement to Deliver Documents.*  For the purposes of Section 4(a) of the Agreement, for each Insured Transaction, each party agrees to deliver the following documents in addition to the other  documents specified in this Agreement, as applicable:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party B | Swap Insurance Policy | Upon execution of this Agreement. | No |
| Party B | Opinion of Insurer's Counsel with respect to the Swap Insurance Policy | Upon execution of this Agreement. | No |

(xx)    *Opinions.*  All opinions delivered with respect to an Insured Transaction pursuant to Section 4(a) of this Agreement shall also be delivered to Insurer at the address set forth in Section 10(a) of this Agreement.

(xxi)    *Standby Insurer.*  In the event that (i) Insurer shall fail to make an insured payment with respect to the Swap Insurance Policy and (ii) such failure shall continue for three (3) Business Days, then all references to Insurer in this Agreement shall be deemed to be references to Standby Insurer for so long as there is no default under the Standby Swap Insurance Policy issued by Standby Insurer.

6

Part 2. **Agreement to Deliver Documents.**

For the purpose of Section 4(a) of this Agreement, each party agrees to deliver the following documents, as applicable:—

| Party required to deliver document | Form/Document/Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A | A guarantee of Holdings in the form of Exhibit B to this Schedule. | Upon execution of this Agreement. | Yes |
| Party A | An opinion of counsel to Party A substantially in the form of Exhibit C to this Schedule. | Promptly after execution of this Agreement. | Yes |
| Party B | An opinion of counsel to Party B in the form of Exhibit D to this Schedule. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |
| Party B | An incumbency certificate with respect to the signatory of this Agreement. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |
| Party B | A certified copy of the resolution or resolutions (or the equivalent thereof) of the governing body of Party B, certified by an appropriate official of Party B, pursuant to which Party B is authorized to enter into this Agreement and each Transaction, substantially in the form of Exhibit E to this Schedule. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |
| Party B | A certificate from the Chief Executive Officer or the Chief Financial Officer of Party B, or the equivalent of any thereof, to the effect that any requirements of Party B's charter and/or by-laws have been satisfied, substantially in the form of Exhibit F to this Schedule. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |
| Party B | An executed copy of the Covered Indenture. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |
| Party B | Opinions of counsel to each party to the Covered Indenture with respect to the enforceability of the Covered Indenture against such party. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |
| Party B | Standby Swap Insurance Policy issued | Prior to the execution of this | Yes |

7

NYA 334403 7

| Party required to deliver document | Form/Document/Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| | by Standby Insurer. | Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | |
| Party B | Opinion of Counsel to Standby Insurer with respect to the enforceability of the Standby Swap Insurance Policy against Standby Insurer. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |
| Party B | Such other opinion, certificates and other documents as are delivered in connection with the issuance of the SAVRS (as defined in the initial Confirmation entered into pursuant to this Agreement and dated the date hereof). | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |

Part 3. **Miscellaneous.**

(a)    *Addresses for Notices.*  For the purpose of Section 10(a) to this Agreement:—

Address for notices or communications to Party A:—

Address:    3 World Financial Center, 8th Floor, New York, NY 10285

Attention:    Municipal Financial Products - Middle Office

Facsimile No.:  212-526-7372

Telephone No.: 212-526-7133

*With a copy to*:  101 Hudson Street, Jersey City, NJ 07302

Facsimile No.:  201-524-5833

Telephone No.: 201-524-5293

*With respect to Insured Transactions, with a copy to:*

MBIA Insurance Corporation
113 King Street
Armonk, New York 10504
Attention:    IPM-PFG-East
Telephone:  914 273-4545
Facsimile    914 765-3799

And

XL Capital Assurance Inc.

8

NYA 334403.7

250 Park Avenue, 19th Floor
New York, New York 10177
Attention:       Surveillance
Telephone:       646 658-5900
Facsimile:       646 658-5955

Address for notices or communications to Party B:—

Address:         c/o LCOR Incorporated, 6701 Democracy Blvd., Suite 711, Bethesda, Maryland 20817

Attention:       R. William Hard

Facsimile No.: (301) 897-3713

Telephone No.: (301) 897-0002

*With a copy to:*

LCOR Incorporated
Suite 110 Berwyn Park
Berwyn, Pennsylvania 19312
Attention: Peter Dilullo

*With respect to Insured Transactions, with a copy to:*

MBIA Insurance Corporation
113 King Street
Armonk, New York 10504
Attention:       IPM-PFG-East
Telephone:       914 273-4545
Facsimile        914 765-3799

And

XL Capital Assurance Inc.
250 Park Avenue, 19th Floor
New York, New York 10177
Attention:       Surveillance
Telephone:       646 658-5900
Facsimile:       646 658-5955

(b)   *Calculation Agent.* The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(c)   *Credit Support Document.* Details of any Credit Support Document:—

In the case of Party A, a guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit B and the ISDA Credit Support Annex set forth in Exhibit G hereto and incorporated by reference herein.

In the case of Party B, the ISDA Credit Support Annex set forth in Exhibit G hereto and incorporated by reference herein.

9

(d)  *Credit Support Provider.*  Credit Support Provider means in relation to Party A:  Holdings.

(e)  *Governing Law.*  This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(f)  *Netting of Payments.*  Subparagraph (ii) of Section 2(c) of this Agreement will not apply to all Transactions.

(g)  *"Affiliate"* will have the meaning specified in Section 12 of this Agreement.

(h)  *"Covered Indenture"* means, collectively, the Trust Agreement, the Leases and the Deed of Trust.

(i)  *"Trust Agreement"* means the Trust Agreement, dated as of December 1, 2001, by and between Party B and Bankers Trust Company, as Trustee, as amended and supplemented prior to the date hereof in accordance with the terms thereof and as amended and supplemented following the date hereof in accordance with the terms hereof and thereof.

(j)  *"Leases"* means, collectively, the GSA Lease and the USPTO Lease

(k)  *"GSA Lease"* means the U.S. Government Lease For Real Property [Lease No. GS-11B-LVA80671], dated June 1, 2000, by and between Party B and the United States of America, as amended and supplemented prior to the date hereof in accordance with the terms thereof and as amended and supplemented following the date hereof in accordance with the terms hereof and thereof.

(l)  *""USPTO Lease"* means the U.S. Government Lease For Real Property [Lease No. USPTO 01-100], dated December 19, 2001, by and between Party B and the United States Patent and Trademark Office, as amended and supplemented prior to the date hereof in accordance with the terms thereof and as amended and supplemented following the date hereof in accordance with the terms hereof and thereof.

(m)  *"Deed of Trust"* means the Deed of Trust, Fixture Filing and Security Agreement, dated as of December 1, 2001, from Party B, as Grantor, to David W. Briggs and LaFonte Nesbitt, as Mortgage Trustees, and for the benefit of MBIA Insurance Corporation, XL Capital Assurance Inc., Party A and Bankers Trust Company, as amended and supplemented prior to the date hereof in accordance with the terms thereof and as amended and supplemented following the date hereof in accordance with the terms hereof and thereof.

(n)  *"Covered Indenture Incorporation Date"* means the date of this Agreement.

**Part 4.  Other Provisions.**

(a)  *Agreements.*

(i)    The introductory clause of Section 4 of this Agreement is hereby amended to read in its entirety as follows:—

"Each party agrees with the other (or, in the case of Section 4(d) and (e), Party B agrees with the other party) that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—".

(ii)    Section 4 of this Agreement is hereby amended by adding the following subsections "(d)" and "(e)" thereto:—

"(d)  *Compliance with Covered Indenture.*  Party B will observe, perform and fulfill each provision in the Covered Indenture applicable to Party B in effect on the Covered Indenture Incorporation

10

Date, as any of those provisions may be amended, supplemented or modified for purposes of this Agreement with the prior written consent of the other party hereto (the "Incorporated Provisions"), with the effect that such other party hereto will have the benefit of each of the Incorporated Provisions (including without limitation, covenants, right to consent to certain actions subject to consent under the Covered Indenture and delivery of financial statements and other notices and information). In the event the Covered Indenture ceases to be in effect prior to the termination of this Agreement, the Incorporated Provisions (other than those provisions requiring payments in respect of bonds, notes, warrants or other similar instruments issued under the Covered Indenture) will remain in full force and effect for purposes of this Agreement as though set forth herein until such date on which all of the obligations of Party B under this Agreement and any obligations of Party B or any Credit Support Provider of Party B under a Credit Support Document have been fully satisfied. The Incorporated Provisions are hereby incorporated by reference and made a part of this Agreement to the same extent as if such provisions were set forth herein. For purposes of this Agreement, the Incorporated Provisions shall be construed as though (i) all references therein to any party making loans, extensions of credit or financial accommodations thereunder or commitments therefor (the "Financings") were to the other party hereto and (ii) to the extent that such Incorporated Provisions are conditioned on or relate to the existence of such Financings or Party B having any obligations in connection therewith, all references to such Financings or obligations were to the obligations of Party B under this Agreement. Any amendment, supplement, modification or waiver of any of the Incorporated Provisions without the prior written consent of the other party hereto shall have no force and effect with respect to this Agreement. Any amendment, supplement or modification for which such consent is obtained shall be part of the Incorporated Provisions for purposes of this Agreement. Notwithstanding the foregoing, the right of Party A to consent to certain amendments of the Trust Agreement and Deed of Trust shall be subject to the terms and provisions set forth therein.

(e) *Security and Source of Payment of Party B's Obligations*. This Agreement, together with the Transaction entered into pursuant hereto in the Confirmation dated the date hereof (the "Initial Transaction"), constitutes the "Hedge Agreement" as defined in Section 1.1 of the Trust Agreement. The obligation of Party B to make payments to Party A under this Agreement and the Initial Transaction which are insured by the Swap Insurance Policy (the "Insured Amounts") is secured on a parity with the Bonds by (i) the Deed of Trust, (ii) a first priority direct assignment of the Leases and the Construction Contract, (iii) security interests in the Pledged Revenues, (iv) the amounts payable under the Bond Insurance Policy; (v) security interest in Party B's interests in the fixtures and intangible personal property related to the Project, and (vi) all of the funds and accounts held by the Trustee pursuant to the terms of the Trust Agreement other than the Excluded Funds and Accounts, and other property which may from time to time become subject to the Lien of the Trust Agreement or the Deed of Trust or which may otherwise come into the possession or control of the Trustee for the benefit of the Bond Owners and Party A and, on a subordinated basis, the Bond Insurer (the "Security"), as more specifically set forth in the Trust Agreement. The obligation of Party B to make payments to Party A under this Agreement and the Initial Transaction which are not Insured Amounts is secured by the Security on a basis directly subordinate to the lien thereon in favor of the Insured Amounts and the Bonds, as more specifically set forth in the Trust Agreement. Capitalized terms used in this Section 4(e) and not defined herein have the respective meanings ascribed to them in the Trust Agreement."

(b) *Definitions*. Section 12 of this Agreement is hereby amended to add the following definitions in their appropriate alphabetical order:—

" '*Covered Indenture*' has the meaning specified in the Schedule."

" '*Covered Indenture Incorporation Date*' has the meaning specified in the Schedule."

11

Miscellaneous:

(c)    *Confirmation.* A form of Confirmation is set forth as Exhibit A hereto.

(d)    "Stockholders' Equity" means with respect to Holdings, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles.

(e)    This Agreement is hereby amended by adding the following Section "13" hereto:—

"**13.    Relationship Between Parties**

Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction): —

(a)    *Non-Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisors as it has deemed necessary. It is not relying o any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. It has not received from the other party any assurance or guarantee as to the expected results of that Transaction.

(b)    *Assessment and Understanding.*   It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(c)    *Status of Parties.* The other party is not acting as a fiduciary for or as an advisor to it in respect of the Transaction."

12

NYA 334403.7

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____

Title:    Vice President

LCOR ALEXANDRIA L.L.C.
By: LCOR Operating Company LLC, its Managing Member
By: LCOR Public/Private L.L.C., its Managing Member


By: _____


Title: _____

NYA 334403.6

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____

Title:_____


LCOR ALEXANDRIA L.L.C.
By: LCOR Operating Company LLC, its Managing Member
By: LCOR Public/Private L.L.C., its Managing Member

By: _____

Title: _Executive Vice President_

<u>EXHIBIT A to Schedule</u>

<u>Form of Confirmation</u>

[Date]

<u>TRANSACTION</u>

LCOR Alexandria L.L.C.
c/o LCOR Incorporated
6701 Democracy Blvd., Suite 711
Bethesda, Maryland 20817

Ladies and Gentlemen:

The purpose of this letter agreement is to set forth the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This letter agreement constitutes a "Confirmation" as referred to in the Master Agreement specified below.

The definitions and provisions contained in the 1992 ISDA U.S. Municipal Counterparty Definitions (as published by the International Swaps and Derivatives Association, Inc.) (the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between those Definitions and this Confirmation, this Confirmation will govern.

1. This Confirmation supplements, forms part of, and is subject to the Master Agreement dated as of December 13, 2001 (the "Agreement") between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

2. The terms of the particular Transaction to which this Confirmation relates are as follows:—

Party A:                              LEHMAN BROTHERS SPECIAL FINANCING INC.

Party B:                              LCOR ALEXANDRIA L.L.C.

[Notional Amount:]

Trade Date:

Effective Date:

Termination Date:

FIXED AMOUNTS:

Fixed Rate Payer:
                                      [Party A/B]

Exhibit A
Page 1

NYA 334403.7

[Fixed Rate Payer
  Currency Amount:]

Fixed Rate Payer Payment Dates [or, Period End Dates, if Delayed Payment or Early Payment applies]:

[          ], subject to adjustment in accordance with the    [Following/Modified    Payment    or [Following/Preceding]    Business    convention,    with respect to a _____ Banking Day and a _____ Banking    Day    [with    No Adjustment of Period End Dates]

[Fixed Amount:]

Fixed Rate:

Fixed Rate Day Count Fraction:

FLOATING AMOUNTS:

Floating Rate Payer:

[Party B/A]

[Floating Rate Payer
  Currency Amount:]

Floating Rate Payer Payment Dates [or, Period End Dates, if Delayed Payment or Early Payment applies]:

[          ], subject to adjustment in accordance with the    [Following/Modified    Payment    or [Following/Preceding]    Business    convention,    with respect to a _____ Banking Day and a _____ Banking    Day    [with    No Adjustment of Period End Dates]

Floating Rate for initial Calculation Period:

Floating Rate Option:

Designated Maturity:

Floating Rate Spread:

[plus/minus]    % p.a.

Floating Rate Day Count Fraction:

Reset Dates:

[Rate Cut-off Dates:]

[Method of Averaging:

Unweighted/Weighted Average Rate]

Compounding:

Applicable/Inapplicable

Exhibit A
  Page 2

[Compounding Dates:]

[Initial Exchange:

Initial Exchange Date:

Party A Initial Exchange Amount:

Party B Initial Exchange Amount:

Final Exchange:

Final Exchange Date:

Party A Final Exchange Amount:

Party B Final Exchange Amount:]

Calculation Agent:

3.    Account Details

Payments to Party A

Account for payments in [first currency]:                                   [    ]

Account for payments in [second currency]:                            [    ]

Payments to Party B

Account for payments in [first currency]:                                   [    ]

Account for payments in [second currency]:                            [    ]

4.    Offices

The Office of Party B for the Transaction is [                    .]

5.    [Broker/Arranger:        ]

Exhibit A
Page 3

NYA 334403.7

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____

Name:_____

Title:_____

Confirmed as of the
date first written

LCOR ALEXANDRIA L.L.C.
By: LCOR Operating Company LLC, its Managing Member
By: LCOR Public/Private L.L.C., its Managing Member

By:_____

Name:_____

Title:_____

[Or if after the date of the Agreement, use the following signature block for Party B:

LCOR ALEXANDRIA L.L.C.
By: LCOR PTO Headquarters LLC, its Managing Member
By: LCOR Propery Company LLC, its Managing Member
By: LCOR Public/Private L.L.C., its Managing Member

By:_____

Name:_____

Title:_____]

Exhibit A
Page 4

NYA 334403.7

EXHIBIT B to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

       LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and LCOR ALEXANDRIA L.L.C. ("Party B") have entered into a Master Agreement dated as of December 13, 2001, pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

       (a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable, but not later than one (1) Business Day following the date due from Party A.

       (b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

       (c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor; provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligation under the Agreement or to set off, counterclaim or withhold payment in respect of any Event of Default or potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

       (d)    Guarantor shall be subrogated to all rights of Party B against Party A in respect of any amounts paid by Guarantor pursuant to the provisions of this Guarantee; provided, however, that Guarantor shall not be entitled to enforce or to receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by Party A under the Agreement, shall have been paid in full.

       (e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Agreement affecting Party A or Guarantor.

       (f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection

NYA 334403.7

with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

Guarantor makes the same representations to and agreements with Party B as those made by Party A pursuant to Sections 3 and 4 of the Agreement, at the times set forth therein, except that references therein to "the party" will be deemed to be references to "the Guarantor" and references therein to "the Agreement" will be deemed to be references to "the Guarantee." Section 11 of the Agreement is incorporated by reference in this Guarantee except that references therein to "the Agreement" will be deemed to be references to "the Guarantee."

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee are defined in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Treasurer, at 3 World Financial Center, 24th Floor, New York, New York 10285 (Facsimile No. (212) 526-1466) with a copy to Lehman Brothers Special Financing Inc., Attention: Municipal Financial Products - Middle Office at 3 World Financial Center, 8th Floor, New York, New York 10285 (Telex No. 175636 Answerback: SLB; Facsimile No. (212) 526-7372).

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By:_____

Title:_____

Exhibit B
Page 2

<u>EXHIBIT C to Schedule</u>

[Form of Opinion of Counsel to
Lehman Brothers Special Financing Inc. and
Lehman Brothers Holdings Inc.]

[Date]

LCOR Alexandria L.L.C.
c/o LCOR Incorporated
6701 Democracy Blvd., Suite 711
Bethesda, Maryland 20817

[*With respect to Insured Transactions only*:

MBIA Insurance Corporation
113 King Street
Armonk, New York 10504

And

XL Capital Assurance Inc.
250 Park Avenue, 19th Floor
New York, New York 10177]

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc., a Delaware corporation ("Party A") and Lehman Brothers Holdings Inc., a Delaware corporation ("Guarantor"), and am familiar with matters pertaining to the execution and delivery of the Master Agreement (the "Master Agreement") dated as of December 13, 2001 between Party A and LCOR Alexandria L.L.C. ("Party B") and the guarantee of Guarantor (the "Guarantee") delivered in connection with the Master Agreement. The Master Agreement is to be supplemented by confirmations of transactions to be entered into by Party A and Party B from time to time (each a "Confirmation") and the Master Agreement together with all such Confirmations shall constitute one agreement.

In connection with this opinion, I have examined, or have had examined on my behalf, an executed copy of each of the Master Agreement, the Guarantee, certificates and statements of public officials and officers of Party A and Guarantor and such other agreements, instruments, documents and records as I have deemed necessary or appropriate for the purposes of this opinion.

Based upon the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1.      Each of Party A and Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware.

Exhibit C
Page 1

NYA 334403.7

2.      The execution, delivery and performance of the Master Agreement, in the case of Party A, and the Guarantee, in the case of Guarantor, are within its corporate power, have been duly authorized by all necessary corporate action and do not conflict with any provision of its certificate of incorporation or by-laws.

3.      Each of the Master Agreement, in the case of Party A, and the Guarantee, in the case of Guarantor, has been duly executed and delivered and constitutes, a legal, valid and binding obligation, enforceable against it in accordance with its terms.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A.      My opinion in paragraph 3 above is subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers) and general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law.

B.      I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the laws of the State of New York, the United States of America and the General Corporation Law of the State of Delaware.

C.      My opinions are limited to the present laws and to the facts as they presently exist.  I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.      This letter is rendered to you in connection with the Master Agreement and the Guarantee and the transactions related thereto and may not be relied upon by any other person or by you in any other context or for any other purpose.  This letter may not be quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Party A and Guarantor, except that (a) you may furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Party A or Guarantor, (iii) pursuant to the order of any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Master Agreement or the Guarantee; and (b) MBIA Insurance Corporation ("Insurer") may quote from this opinion, and furnish copies, to (collectively, "publish to") (w) any reinsurer (or risk transferee) of Insurer or prospective reinsurer (or risk transferee) of Insurer, (x) any rating agency or regulatory agency or authority then rating or regulating Insurer (including, but not limited to, the National Association of Insurance Commissioners), (y) any accountant or lawyer for any person to whom it may be published, or (z) pursuant to the order of any court or regulator of any person to whom it may be published.

E.      I have assumed with your permission (i) the genuineness of all signatures by each party other than Party A or Guarantor, (ii) the authenticity of document submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as copies, and (iii) the due execution and delivery, pursuant to due authorization, of the Master Agreement by each party other than Party A.

Very truly yours,

Exhibit C
Page 2

EXHIBIT D to Schedule

[Form of Opinion of Counsel to Party B]

[Date]

Lehman Brothers Special Financing Inc.
3 World Financial Center
8th Floor
New York, New York 10285

Lehman Brothers Holdings Inc.
3 World Financial Center
24th Floor
New York, New York 10285

*[With respect to Insured Transactions only with a reliance letter on this opinion to:*

MBIA Insurance Corporation
113 King Street
Armonk, New York 10504

And

XL Capital Assurance Inc.
250 Park Avenue, 19th Floor
New York, New York 10177]

Ladies and Gentlemen:

We have acted as special counsel to LCOR Alexandria L.L.C., a limited liability company of the State of Delaware ("Party B") in connection with the execution and delivery of the Master Agreement (the "Master Agreement") dated as of December 13, 2001 between Lehman Brothers Special Financing Inc. ("Party A") and Party B and the Confirmation (the "Confirmation"), dated _____, between Party A and Party B. The Master Agreement and the Confirmation shall constitute one agreement.

In connection with this opinion, we have examined an executed copy of the Master Agreement and the Confirmation and such documents and records of Party B, certificates of officers of Party B and such other documents as we have deemed necessary or appropriate for the purposes of this opinion. In such opinion, we have assumed the genuineness of all the signatures, the authenticity of all documents submitted to us as originals and the conformity to authentic original documents of all documents submitted to us as certified, conformed or photostatic copies.

Based upon the foregoing, we are of the opinion that:

1.      Party B is validly existing as a limited liability company in good standing under the laws of the State of Delaware.

Exhibit D
Page 1

NYA 334403.7

2.      Party B has the limited liability company power to enter into the Master Agreement and the Confirmation and to perform its obligations thereunder.

3.      The execution and delivery of the Master Agreement and the Confirmation by Party B and the performance by Party B of its obligations thereunder will not result in a violation of the Certificate of Formation or Party B or the Third Amended and Restated Members Agreement of Party B.

4.      Each of the Master Agreement and the Confirmation has been duly authorized, executed and delivered by Party B and is a valid and binding agreement of Party B, enforceable against Party B in accordance with its terms.

5.      No consent, approval, authorization or other order of, or registration or filing with, any court or other governmental or regulatory authority or agency is required to be made or obtained for Party B to execute, deliver and perform the Master Agreement and the Confirmation or consummate the transactions contemplated thereby.

6.      [In separate opinions - Opinion re: security and source of payment of Party B's obligations, enforceability of Covered Indenture.]

[Opinion may be subject to standard assumptions, qualifications and limitations.]

Very truly yours,

Exhibit D
Page 2

EXHIBIT E to Schedule

Form of Resolutions

RESOLVED that (i) LCOR Alexandria L.L.C. ("_____") enter into interest rate swap and any similar transactions and (ii) the form, terms and provisions of the Master Agreement (the "Agreement") dated as of December 13, 2001, between Lehman Brothers Special Financing Inc. ("Lehman") and _____, in the form previously presented to _____ (with such changes, not inconsistent with the intent of these resolutions and the intent of the Board of Directors as the officer(s) executing the same, as evidenced by their execution thereof, shall deem necessary or desirable), and the actions contemplated thereby (including the entry by _____ into Transactions with Lehman evidenced by confirmations thereof) be, and they hereby are, in all respects approved, authorized, adopted, ratified and confirmed.

RESOLVED that _____ is hereby authorized to enter into the Agreement, in substantially the form presented to this meeting and, from time to time, one or more interest rate swap transactions and agreements terminating any such interest rate swap transaction, pursuant to the Agreement and the documents (each a "Confirmation") exchanged between the parties confirming such interest rate swap transactions. The terms of each interest rate swap transaction, including interest rate, term, Notional Amount (as defined in the Agreement) and options as to commencement and termination of payments, and each termination agreement shall be as described in the Agreement and as provided in the related Confirmation, as approved from time to time by the officers of _____ authorized to execute the Confirmation. The aggregate Notional Amount, as defined in the Agreement, of such interest rate swap transactions outstanding at any one time, net of offsetting interest rate swap transactions, shall not exceed $_____ and each such interest rate swap transaction shall terminate not exceeding _____ years after its effective date. The aggregate Notional Amount of all such interest rate swap transactions as of any time shall be determined on a net basis, i.e., where any such transaction is entered into to offset or reverse an earlier transaction, to the extent of the offsetting or reversing effect, the Notional Amounts of such offsetting or reversing interest rate swap transactions shall not be included in the aggregate total.

RESOLVED that the actions contemplated in the Agreement, and each Confirmation, are hereby in all respects approved, authorized, adopted, ratified and confirmed.

RESOLVED that all officers or officials of _____ be, and each of them hereby is, authorized to execute and deliver (i) the Agreement in the name and on behalf of _____ and if necessary or advisable under its corporate seal (which may be attested by the [Secretary or any Assistant Secretary or the equivalent thereof] of _____) or otherwise and (ii) such other agreements and documents as are contemplated by the Agreement or are otherwise necessary in connection with entering into interest rate swap and any similar transactions, as any such officer or official shall deem appropriate, including without limitation, officer certificates, legal opinions and credit support documents.

RESOLVED that all officers or officials of _____ and its agents and counsel be, and each of them hereby is, authorized to take all such further actions, to execute and deliver such further instruments and documents in the name and on behalf of _____ and if necessary or advisable under its corporate seal (which may be attested by the [Secretary or any Assistant Secretary or the equivalent thereof] of _____) or otherwise to pay all such expenses as in his judgment shall be necessary or advisable in order fully to carry out the purposes of the foregoing resolutions.

RESOLVED that all actions previously taken or that will be taken by any director, officer, official, employee or agent of _____ in connection with or related to the matters set forth in or

NYA 334403.7

reasonably contemplated by the foregoing resolutions be, and each of them hereby is, adopted, ratified, confirmed and approved in all respects as the acts and deeds of _____.

NYA 334403.7

EXHIBIT F to Schedule

Officer's Certificate

The undersigned the [Chief Executive Officer] [Chief Financial Officer] of LCOR Alexandria L.L.C. (the "Company") hereby certifies in connection with the Master Agreement (the "Master Agreement") dated as of December 13, 2001, between Lehman Brothers Special Financing Inc. ("Lehman") and the Company that:

the Company has taken all action required to be taken to ensure that the Master Agreement and any Confirmation entered into or to be entered into, and the Transactions contemplated thereby, are authorized under and comply in all respects with [its charter and/or by-laws], including

[set forth any actions required to be taken.]

Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Master Agreement.

IN WITNESS WHEREOF, this Certificate has been executed as of this _____ day of _____.

Exhibit F
Page 1

# Exhibit 2

# LEHMAN BROTHERS

Execution Copy

<u>AMENDED AND RESTATED CONFIRMATION</u>

March 30, 2005

INSURED TRANSACTION

LCOR Alexandria L.L.C.
c/o LCOR Incorporated
6701 Democracy Blvd., Suite 711
Bethesda, Maryland 20817

Re:    $60,200,000
        LCOR Alexandria L.L.C.
        Series 2001 E Floating Rate Bonds
        (CUSIP # 50181QAM0) (the "Special Floating Rate Bonds")

Global ID:  212926

Ladies and Gentlemen:

The purpose of this letter agreement (this "Fourth Amended and Restated Confirmation") is to amend and restate the terms and conditions of the Transaction originally entered into between us on the Trade Date specified below (the "Original Transaction", as amended and restated on July 14, 2004, the "First Amendment", as further amended and restated on October 14, 2004, the "Second Amendment", as further amended and restated on November 19, 2004, the "Third Amendment", and as amended and restated herein, the "Transaction"). This letter agreement constitutes a "Confirmation" as referred to in the Master Agreement specified below. This Transaction constitutes an Insured Transaction as set forth in the Master Agreement specified below and it is therefore subject to the special provisions of the Master Agreement applicable to Insured Transactions.

The definitions and provisions contained in the 1992 ISDA U.S. Municipal Counterparty Definitions (as published by the International Swaps and Derivatives Association, Inc.) (the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and this Confirmation, this Confirmation will govern.

1.    This Confirmation supplements, forms part of, and is subject to the Master Agreement dated as of December 13, 2001 (the "Agreement") between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

2.    The terms of the particular Transaction to which this Confirmation relates are as follows:

Party A:        LEHMAN BROTHERS SPECIAL FINANCING INC.

Party B:        LCOR ALEXANDRIA L.L.C.

NYK 950186-3 071370 0011

| | |
|---|---|
| Notional Amount: | $60,200,000, which shall reduce in such amounts and on such dates as set forth in Annex I hereto. |
| Trade Date: | December 13, 2001 |
| Effective Date: | December 20, 2001 |
| Termination Date: | September 15, 2032 |
| FIXED AMOUNTS: | |
| Fixed Rate Payer: | Party B |
| Fixed Rate Payer Payment Dates: | Quarterly on each March 15, June 15, September 15 and December 15, commencing on March 15, 2002 and terminating on the Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |
| Fixed Rate Payer Period End Dates: | Quarterly on each March 15, June 15, September 15 and December 15, commencing on March 15, 2002 and terminating on the Termination Date. No Adjustment shall apply to Fixed Rate Payer Period End Dates. |
| Fixed Rate: | 6.8005%, subject to paragraph 6 hereof. |
| Fixed Rate Day Count Fraction: | 30/360 |
| FLOATING AMOUNTS: | |
| Floating Rate Payer: | Party A |
| Floating Rate Payer Payment Dates: | Quarterly, five Business Days prior to each March 15, June 15, September 15 and December 15, commencing on June 15, 2005 and terminating on the Termination Date. |
| Floating Rate Payer Period End Dates: | Quarterly on each March 15, June 15, September 15 and December 15, commencing on June 15, 2005 and terminating on the Termination Date. No Adjustment shall apply to Floating Rate Payer Period End Dates. |
| Floating Rate Option: | The sum of (i) USD-LIBOR-BBA and (ii) 0.23%. |
| Designated Maturity: | Three month |
| Reset Date: | March 30, 2005 and thereafter each Floating Rate Payer Period End Date. As specified in the Definitions, the rate for each Reset Date shall be the rate which appears on the Telerate Page 3750 as of 11:00 a.m., London time, on the day that is two London Banking Days preceding that Reset Date. |
| Floating Rate Day Count Fraction: | Actual/360 |

- 2 -

Method of Averaging:        Inapplicable

Compounding:        Inapplicable

3.     The following Additional Termination Event shall apply to Party A and Party B in respect of this Transaction and shall be an Additional Termination Event under Section 5(b)(iii) of the Agreement:

> Party A or its affiliate shall be the owner of all or a portion of the Special Floating Rate Bonds (the "Terminated Portion") then currently outstanding and shall have notified Party B of its intention to effect a conversion of the Terminated Portion at the Fixed Rate provided in this Confirmation pursuant to Section 2.10(e) of the Trust Agreement.

If the Terminated Portion is less than the then-current Notional Amount of this Transaction, the Termination Event described herein shall occur solely with respect to such Terminated Portion and this Transaction shall, notwithstanding anything contained in the Agreement to the contrary, continue with respect to the remaining Notional Amount. For purposes of determining the amount payable in respect of an Early Termination Date for the Terminated Portion, and any other previously Terminated Portion, pursuant to this Termination Event, the Settlement Amount shall equal zero. The consent of Insurer shall not be required for the occurrence of this Termination Event. Party B agrees that it shall take all such actions and execute all such documents as may be necessary to effect and document this Termination Event with respect to the Terminated Portion and to amend any other terms of this Transaction as may be necessary in connection therewith.

4.     Notwithstanding paragraph 3 above, if, at any time, Party A or its affiliate shall be the owner of all or a portion of the Special Floating Rate Bonds then currently outstanding, Party A shall have the right, pursuant to Section 2.10(f) of the Trust Agreement, upon not less than thirty (30) days prior written notice to Party B and with the prior written consent of Insurer, to cause such Special Floating Rate Bonds to be converted from the then-current mode to any other mode permitted pursuant to the terms of the Covered Indenture, including, without limitation, a fixed rate mode (which conversion to a fixed rate mode may include, without limitation, conversion to the Fixed Rate provided in this Confirmation). Upon any conversion of such Special Floating Rate Bonds pursuant to this paragraph, the Fixed Rate applicable to this Transaction shall not be adjusted and shall remain such rate through the termination of this Transaction. Party B agrees that it shall take all such actions and execute all such documents as may be necessary to effect and document any conversion contemplated by this paragraph and to amend any other terms of this Transaction as may be necessary in order to have this Transaction relate to the new mode, in a manner that is reasonably acceptable to Party A, including, without limiting the foregoing, in connection with the conversion of all or a portion of such Special Floating Rate Bonds to a fixed rate mode and the termination of all or a portion of this Transaction in connection therewith, Party B agrees that it shall pay any amounts in respect of such termination as shall be payable in accordance with Section 6 of the Agreement (assuming for such purpose (1) the date of such conversion is the Early Termination Date with respect to that portion of the Notional Amount of this Transaction so terminated, (2) Party B is the sole Affected Party for all purposes other than the election to terminate, (3) that portion of this Transaction so terminated is the sole Affected Transaction, and (4) Market Quotation and Second Method are selected for purposes of Payments on Early Termination). In addition, if such Special Floating Rate Bonds are, at any time, converted to variable rate demand bonds, Party A shall designate, in its sole discretion, the remarketing agent for the variable rate demand bonds, which shall be reasonably acceptable to Insurer and which may, without limiting the foregoing, be Party A or an affiliate of Party A. If such Special Floating Rate Bonds have been converted to another mode and subsequently are, at any time, converted back to SAVRS, Party A shall designate, in its

sole discretion, the Broker-Dealer and the Auction Agent in respect of the new SAVRS, both of which shall be reasonably acceptable to Insurer, and either or both of which may, without limiting the foregoing, be Party A or an affiliate of Party A.

5.    For purposes of this Transaction, Party B hereby covenants and agrees that, so long as either party has any obligations under this Transaction, Party B shall not

(a)    if such Special Floating Rate Bonds have been converted back to Select Auction Variable Rate Securities (SAVRS) (the "SAVRS Bonds"), without obtaining the prior written consent of Party A and Insurer, take any of the following actions or cause there to be taken any of the following actions:

(i)    conversion of the SAVRS Bonds to any other mode;

(ii)    adjustment of the auction period in respect of the SAVRS Bonds to a period other than 35 days;

(iii)    selection of any underwriter, broker-dealer or auction agent for the any of the SAVRS Bonds that is not Party A or an affiliate of Party A (provided that any underwriter, broker-dealer or auction agent selected by Party A shall be required to be paid such fees as are consistent with market practice);

provided that, the consent of Party A shall not be required if there has occurred and is continuing an Event of Default as set forth in Section 5(a)(i) of the Master Agreement with respect to Party A as the Defaulting Party; or

(b)    optionally redeem any of the Special Floating Rate Bonds or sell any portion of the Project or the entire Project to the GSA (other than pursuant to the GSA's option to purchase the Project on the termination of the initial lease term of the GSA Lease) or to a third party unless Party B has provided to Party A and Insurer evidence satisfactory to Party A that Party B has (or will have, following such redemption or sale, as applicable) sufficient funds available to pay to Party A any amounts owed (and to be owed) to Party A pursuant to paragraph 6 of this Confirmation (and Section 6 of the Agreement) following such sale and has complied with all other requirements for such optional redemption or for such sale as set forth in the Trust Agreement.

For purposes of the covenants and agreements set forth in this paragraph 5, in the event that Party A declares an Early Termination Date in accordance with Part 1(g)(i) of the Schedule to the Agreement with respect to Section 5(a)(ii) of the Agreement upon the failure by Party B to comply with the provisions of this paragraph 5, for purposes of this Transaction the word "thirtieth" that appears in Section 5(a)(ii) of the Agreement shall be deleted and shall be replaced with the words "next succeeding."

6.    Certain Termination Provisions:  It is hereby acknowledged and agreed by and between the parties hereto that all terminations set forth in this paragraph 6 shall constitute Additional Termination Events under Section 6(b)(iii) of the Agreement and it is further acknowledged and agreed by and between the parties hereto as follows:

(i)    *Sinking Fund Redemption Pursuant to Section 3.1(a) of the Trust Agreement.*  Upon any sinking fund redemption pursuant to Section 3.1(a) of the Trust Agreement, the Notional Amount of this Transaction shall reduce so as to correspond to such scheduled sinking fund redemption of the Special Floating Rate Bonds and no payment shall be required by any party hereto in connection therewith;

(ii)    *Optional Redemptions Pursuant to Sections 3.2, 3.3, and 3.4 of the Trust Agreement:*

- 4 -

(a) Party B shall not permit or cause the optional redemption of any of the Special Floating Rate Bonds unless Party B has provided to Party A and Insurer evidence satisfactory to Party A and Insurer that Party B has (or will have, following such optional redemption) sufficient funds available to pay to Party A any amounts owed (and to be owed) to Party A pursuant to paragraph 6(ii)(b) of this Confirmation (and Section 6 of the Agreement) following such optional redemption and has complied with all other requirements for such optional redemption set forth in the Trust Agreement;

(b) upon any optional redemption of any of the Special Floating Rate Bonds, the Notional Amount of this Transaction corresponding to the principal amount of the Special Floating Rate Bonds so redeemed shall terminate, Party B shall be required to pay any amounts due upon such termination in accordance with Section 6 of the Agreement as if (1) the date of such redemption is the Early Termination Date with respect to that portion of the Notional Amount of this Transaction that corresponds to the principal amount of the Special Floating Rate Bonds so redeemed, (2) Party B is the sole Affected Party for all purposes other than the election to terminate, (3) that portion of this Transaction so terminated is the sole Affected Transaction, and (4) Market Quotation and Second Method are selected for purposes of Payments on Early Termination. Any payments due from Party B to Party A pursuant to this paragraph shall constitute Uninsured Amounts, which amounts are not insured by Insurer and are payable on a subordinate basis to the Special Floating Rate Bonds and the Insured Amounts. Notwithstanding anything herein to the contrary, the parties will be obligated to pay any Unpaid Amounts that would otherwise be due on the Early Termination Date;

(iii)    *Special Optional Redemption Upon Non-Renewal of the Leases Pursuant to Section 3.5 of the Trust Agreement:*

(a) prior to the termination of the initial lease term of the GSA Lease, Insurer has agreed to waive its ability to accelerate the Special Floating Rate Bonds to the extent that such acceleration arises as a result of the USPTO not exercising its option to extend the USPTO Lease during the term of the GSA Lease (but not if such acceleration arises out of some other reason set forth in the Trust Agreement);

(b) Insurer may direct the redemption of any of the Special Floating Rate Bonds upon the non-renewal of the GSA Lease on the termination of the initial lease term of the GSA Lease;

(c) following the termination of the initial lease term of the GSA Lease, Insurer may direct the redemption of any of the Special Floating Rate Bonds upon the non-renewal of the USPTO Lease;

(d) upon any redemption of any of the Special Floating Rate Bonds pursuant to clause (iii)(b) or clause (iii)(c), that portion of the Notional Amount of this Transaction that corresponds to the principal amount of Special Floating Rate Bonds so redeemed shall be terminated;

(e) upon any such termination pursuant to clause (iii)(d), Party B shall be required to pay any amounts due upon such termination in accordance with Section 6 of the Agreement as if (1) the date of such redemption is the Early Termination Date with respect to that portion of the Notional Amount of this Transaction so terminated, (2) Party B is the sole Affected Party for all purposes other than the election to terminate, (3) that portion of the Notional Amount of this Transaction so terminated is the sole Affected Transaction, and (4) Market Quotation and Second Method are selected for purposes of Payments on Early Termination. Any payments due from Party B to Party A pursuant to this paragraph up to $20,000,000 shall constitute Insured Amounts, which amounts are insured by Insurer and are payable on a parity basis with the Special Floating Rate Bonds. Any payments due from Party B to Party A pursuant to this paragraph in excess of $20,000,000 shall constitute Uninsured Amounts, which amounts are not insured by Insurer and are payable on a subordinate basis to the Special Floating Rate Bonds. Notwithstanding anything herein to

NYK 950186-3.071370.0011

the contrary, the parties will be obligated to pay any Unpaid Amounts that would otherwise be due on the Early Termination Date;

    (iv)    *Extraordinary Mandatory Redemption Upon Sale of the Project to the GSA pursuant to its Option Pursuant to Section 3.6 of the Trust Agreement:*

    (a) upon the sale of any portion of the Project to the GSA pursuant to the GSA's option to purchase the Project on the termination of the initial lease term of the GSA Lease, the formula set forth in Section 3.6(b) of the Trust Agreement shall be used to determine the principal amount of the Special Floating Rate Bonds to be redeemed and that portion of the Notional Amount of this Transaction as corresponds to the principal amount of the Special Floating Rate Bonds so redeemed shall terminate;

    (b) upon the sale of the entire Project to the GSA pursuant to the GSA's option to purchase the Project on the termination of the initial lease term of the GSA Lease, all of the Special Floating Rate Bonds shall be redeemed and this Transaction shall terminate;

    (c) upon any sale pursuant to this clause (iv), Party B shall be required to pay any amounts due upon such termination in accordance with Section 6 of the Agreement as if (1) the date of such redemption is the Early Termination Date with respect to this Transaction (or that portion of the Notional Amount of this Transaction that corresponds to the principal amount of the Special Floating Rate Bonds so redeemed), (2) Party B is the sole Affected Party for all purposes other than the election to terminate, (3) this Transaction (or that portion of this Transaction so terminated) is the sole Affected Transaction, and (4) Market Quotation and Second Method are selected for purposes of Payments on Early Termination. Any payments due from Party B to Party A pursuant to this paragraph shall constitute Uninsured Amounts, which amounts are not insured by Insurer and are payable on a subordinate basis to the Special Floating Rate Bonds and the Insured Amounts. Notwithstanding anything herein to the contrary, the parties will be obligated to pay any Unpaid Amounts that would otherwise be due on the Early Termination Date;

    (v)    *Extraordinary Mandatory Redemption For Entire Project Casualty Pursuant to Section 3.7(a) of the Trust Agreement:*

    (a) upon the total casualty to or condemnation of the entire Project (without repair), all of the Special Floating Rate Bonds shall be redeemed and this Transaction shall terminate;

    (b) upon any destruction pursuant to this clause (v), Party B shall be required to pay any amounts due upon such termination in accordance with Section 6 of the Agreement as if (1) the date of such redemption is the Early Termination Date with respect to this Transaction, (2) Party B is the sole Affected Party for all purposes other than the election to terminate, (3) this Transaction is the sole Affected Transaction, and (4) Market Quotation and Second Method are selected for purposes of Payments on Early Termination. Any payments due from Party B to Party A pursuant to this paragraph shall constitute Uninsured Amounts, which amounts are not insured by Insurer and are payable on a subordinate basis to the Special Floating Rate Bonds and the Insured Amounts. Notwithstanding anything herein to the contrary, the parties will be obligated to pay any Unpaid Amounts that would otherwise be due on the Early Termination Date;

    (vi)    *Redemptions Upon Sale of a Portion of the Project Pursuant to Section 7.11 of the Trust Agreement or Extraordinary Mandatory Redemption For Partial Project Casualty Pursuant to Section 3.7(b) of the Trust Agreement:*

    (a) Party B shall not sell any portion of the Project to the GSA (other than pursuant to the GSA's option to purchase the Project on the termination of the initial lease term of the GSA Lease) or to a

- 6 -

third party unless Party B has provided to Party A evidence satisfactory to Party A that Party B has (or will have, following such sale) sufficient funds available to pay to Party A any amounts owed (and to be owed) to Party A pursuant to paragraph 6 of this Confirmation (and Section 6 of the Agreement) following such sale and has complied with all other requirements for such sale set forth in the Trust Agreement;

(b) upon the sale of a portion of the Project or upon the casualty or condemnation of a portion of the Project (without repair), the formula set forth in Section 7.11 or Section 3.7(b), as applicable, of the Trust Agreement shall be used to determine the principal amount of the Special Floating Rate Bonds to be redeemed;

(c) upon a sale of a portion of the Project or upon the casualty or condemnation of a portion of the Project (without repair), that portion of the Notional Amount of this Transaction that corresponds to the principal amount of the Special Floating Rate Bonds so redeemed shall be terminated;

(d) upon any sale or casualty or condemnation pursuant to this clause (vi), Party B shall be required to pay any amounts due upon such termination in accordance with Section 6 of the Agreement as if (1) the date of such redemption is the Early Termination Date with respect to that portion of the Notional Amount of this Transaction that corresponds to the principal amount of the Special Floating Rate Bonds so redeemed, (2) Party B is the sole Affected Party for all purposes other than the election to terminate, (3) that portion of the Notional Amount this Transaction so terminated is the sole Affected Transaction, and (4) Market Quotation and Second Method are selected for purposes of Payments on Early Termination. Any payments due from Party B to Party A pursuant to this paragraph shall constitute Uninsured Amounts, which amounts are not insured by Insurer and are payable on a subordinate basis to the Special Floating Rate Bonds and the Insured Amounts, subordinate only to the payment in full of that portion of the Special Floating Rate Bonds so redeemed (as determined by the formula set forth in the Trust Agreement) and not to payment in full of all of the Special Floating Rate Bonds. Notwithstanding anything herein to the contrary, the parties will be obligated to pay any Unpaid Amounts that would otherwise be due on the Early Termination Date;

(vii)    *Redemptions Upon Sale of the Entire Project Pursuant to Section 7.11 of the Trust Agreement to the GSA (other than pursuant to its one-time option) or to a Third Party:*

(a) Party B shall not sell the entire Project to the GSA (other than pursuant to the GSA's option to purchase the Project on the termination of the initial lease term of the GSA Lease) or to a third party unless Party B has provided to Party A evidence satisfactory to Party A that Party B has (or will have, following such sale) sufficient funds available to pay to Party A any amounts owed (and to be owed) to Party A pursuant to paragraph 6 of this Confirmation (and Section 6 of the Agreement) following such sale and has complied with all other requirements for such sale set forth in the Trust Agreement;

(b) upon any sale of the entire Project, all of the Special Floating Rate Bonds shall be redeemed and this Transaction shall terminate; and

(c) upon any sale pursuant to this clause (vii), Party B shall be required to pay any amounts due upon such termination in accordance with Section 6 of the Agreement as if (1) the date of such redemption is the Early Termination Date with respect to this Transaction, (2) Party B is the sole Affected Party for all purposes other than the election to terminate, (3) this Transaction is the sole Affected Transaction, (4) Market Quotation and Second Method are selected for purposes of Payments on Early Termination. Any payments due from Party B to Party A pursuant to this paragraph shall constitute Uninsured Amounts, which amounts are not insured by Insurer and are payable on a subordinate basis to the Special Floating Rate Bonds and the Insured Amounts. Notwithstanding anything herein to the contrary, the

NYK 950186-3 071370.0011

parties will be obligated to pay any Unpaid Amounts that would otherwise be due on the Early Termination Date.

Nothing in this paragraph 6 shall restrict or prohibit Party B from selling all or any portion of the Project to the GSA or a third party if no Special Floating Rate Bonds are redeemed upon such sale (and therefor no portion of this Transaction is being terminated) and the purchaser is making such purchase expressly subject to the terms of the Special Floating Rate Bonds, the Agreement and this Confirmation (that is, the obligations of Party B under the Agreement and this Transaction are being transferred to the purchaser in accordance with the terms of the Agreement).

Capitalized terms used in this paragraph 6 and not defined herein have the respective meanings ascribed to such terms pursuant to the Agreement or the Trust Agreement (as defined in the Agreement), as applicable.

7.      Non-Recourse Obligations of Party B; Non-Petition Covenant.  Notwithstanding anything herein or in the other transaction documents to the contrary, the parties hereto agree that all payment obligations of Party B hereunder shall be recourse against the assets of Party B only to the extent specifically provided for in the payment priorities set forth in the Trust Agreement and if not provided for therein, only to the extent of amounts released from the lien of the Trust Agreement and paid to Party B pursuant to the Trust Agreement. Notwithstanding any prior termination of this Transaction, each of the parties hereto agrees that it shall not, prior to one year and one day after the stated maturity date of the Special Floating Rate Bonds, acquiesce, petition or otherwise invoke or cause Party B or its managing member to invoke the process of the United States of America, any State or political subdivision thereof or any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government for the purpose of commencing or sustaining a case by or against Party B or its managing member under a Federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of Party B or its managing member or all or any part of its respective property or assets or ordering the winding up or liquidation of the affairs of Party B or its managing member. The parties agree that damages will be an inadequate remedy for breach of this covenant and that this covenant may be specifically enforced.

8.      Pursuant to Section 2(b) of Amendment No. 2 to the Trust Agreement, dated March 1, 2005, between Party B and Deutsche Bank Trust Company Americas, amending Section 2.1 of the Covered Indenture, Party A has, as of March 30, 2005 (the "Conversion Date"), elected to effect a conversion of each of the remaining Series of the SAVRS to the Special Floating Rate Bonds. Party A and Party B are entering into this Amended and Restated Confirmation in order to set forth the terms of such conversion and the terms of this Transaction following such conversion. The total principal amount of the SAVRS being converted to the Special Floating Rate Bonds shall equal $60,200,000 (the "March 2005 Conversion"). No amounts shall be payable by either party with respect to the March 2005 Conversion. For purposes of determining the Floating Amount payable on the Floating Rate Payer Payment Date next succeeding the Conversion Date, this Transaction shall be deemed to have been converted as of the Floating Rate Payer Period End Date immediately preceding the Conversion Date.

9.      **Insurer Consent.**  The consent of Insurer is required, pursuant to Part 1(g)(xiv) of the Agreement, in connection with the execution of this Fourth Amended and Restated Confirmation. By execution hereof, Insurer acknowledges that such consent has been granted.

10.     **Amended and Restated Transaction.**  This Transaction amends and restates the Third Amendment. None of the First Amendment, the Second Amendment, the Third Amendment or the Original Transaction shall be of any further force or effect, and neither Party A nor Party B shall owe any amounts or have any other obligation thereunder.

- 8 -

11.    Upon a conversion of the Special Floating Rate Bonds to SAVRS Bonds, the parties hereto agree that this Confirmation shall be amended and restated so that the provisions hereof shall apply to the SAVRS Bonds.

12.    Payment Instructions:

Payments to Party A:

JP Morgan Chase
ABA: 021000021
for the Account of Lehman Brothers Special Financing Inc.
Account No. 066 143 543

Payments to Party B:

The Bank of New York
ABA No. 021 000 018
FSA Capital Markets Svc LLC
Tax ID: 13-417-5939
Fed Delivery Instructions:  ABA # 021000018 BK OF NYC/FAA
PTC Instructions:  BKNYC-Info Field: FFP
Fed Funds Instructions:  ABA # 021000018 BK OF NYC/GLA 111569/FAA

13.    Please check this Confirmation carefully and immediately upon receipt so that errors or discrepancies can be promptly identified and rectified.  Please confirm that the foregoing correctly sets forth the terms of the agreement between Party A and Party B with respect to the particular Transaction to which this Confirmation relates by signing in the space provided below and immediately returning a copy of the executed Confirmation to Party A.

NYK 950186-3.071370.0011

04/01/2005    13:21    LEHMAN → 912125200384                                                NO.853    D01

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name: T. COURTNEY JENKINS
Title:        VICE PRESIDENT

Confirmed as of the
date first above written

LCOR ALEXANDRIA L.L.C.
By: LCOR Operating Company LLC, its Managing Member
By: LCOR Public/Private L.L.C., its Managing Member

By: _____
Name: Thomas J. O'Brien
Title: Senior Vice President

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
Name:
Title:

Confirmed as of the
date first above written

LCOR ALEXANDRIA L.L.C.
By: LCOR Operating Company LLC, its Managing Member
By: LCOR Public/Private L.L.C., its Managing Member

By:_____
Name:  Thomas J. O'Brien
Title: Senior Vice President

By its execution below, MBIA Insurance Corporation, as Insurer, consents to the Transaction set forth in the Fourth Amended and Restated Confirmation, dated March 30, 2005, between Lehman Brothers Special Financing Inc. and LCOR Alexandria L.L.C.

MBIA INSURANCE CORPORATION

By: _____

Name: *Thomas H. Cochran*

Title: *Director, Global Public Finance Insured Portfolio Management*

ANNEX I
to the Amended and Restated Confirmation, dated March 30, 2005,
between Lehman Brothers Special Financing Inc.
and LCOR Alexandria L.L.C.

Notional Amount

| Reduction Date | Notional Amount Reduction |
|---|---|
| 06/15/2031 | $2,050,000.00 |
| 09/15/2031 | 3,350,000.00 |
| 12/15/2031 | 3,400,000.00 |
| 03/15/2032 | 17,350,000.00 |
| 06/15/2032 | 17,650,000.00 |
| 09/15/2032 | 16,400,000.00 |

- 12 -

# Exhibit 3

From:   **LCOR Alexandria L.L.C.**
        c/o LCOR Incorporated
        6701 Democracy Blvd., Suite 711
        Bethesda, Maryland 20817

To:     **Lehman Brothers Special Financing Inc.**
        3 World Financial Center, 8th Floor
        New York, NY 10285
        Attention: Municipal Financial Products - Middle Office
        Facsimile: 212-526-7372
        Telephone: 212-526-7133

        with a copy to:
             101 Hudson Street, Jersey City, NJ 07302
             Facsimile: 201-524-5833
             Telephone: 201-524-5293

**MBIA Insurance Corporation**
113 King Street
Armonk, New York 10504
Attention: IPM-PFG-East
Telephone: 914-273-4545
Facsimile: 914-765-3799

**XL Capital Assurance Inc.**
250 Park Avenue, 19th Floor
New York, New York 10177
Attention: Surveillance
Telephone: 646-658-5900
Facsimile: 646-658-5955

RECEIVED DEC 1 1 2008
Hand

December 9, 2008

Dear Sirs,

### NOTICE DESIGNATING AN EARLY TERMINATION DATE

We refer to the 1992 ISDA Master Agreement (Local Currency-Single Jurisdiction) between us, LCOR Alexandria L.L.C., and you, Lehman Brothers Special Financing Inc., dated as of December 13, 2001 (the "**Master Agreement**"), together with the Schedule thereto, dated as of December 13, 2001 (the "**Schedule**"), and the Confirmation thereunder, dated as of December 13, 2001 (as amended and restated as of July 14, 2004, October 14, 2004, November 19, 2004 and March 30, 2005) (the "**Confirmation**"). Terms not otherwise defined in this letter shall have the meanings set out in the Confirmation.

It has come to our attention that Lehman Brothers Special Financing Inc. has filed for voluntary bankruptcy protection under chapter 11 of title 11 of the United States Bankruptcy Code, and that Lehman Brothers Holdings Inc., the Credit Support Provider for Lehman Brothers Special Financing Inc. under the Transaction pursuant to Part 3(d) of the Schedule, has become subject to appointment of a receiver. These events constitute Events of Default under Section 5(a)(vii)(4) and (6), respectively, of the Master Agreement.

In addition, the long-term senior unsecured debt of Lehman Brothers Holdings Inc. has been downgraded below BBB+ by S&P, and below Baa1 by Moody's. These rating downgrades constitute an Additional Termination Event under Part 1(g)(iii)(C) of the Schedule and a Termination Event under Section 5(b)(iii) of the Master Agreement.

Accordingly, pursuant to Sections 6(a) and 6(b) of the Master Agreement, by this notice we hereby designate December 16, 2008 as the Early Termination Date in respect of the outstanding Transaction under the Confirmation.

The consequence of the occurrence of an Early Termination Date is that:

(a)     no further payments or deliveries under Section 2(a)(i) or 2(e) of the Master Agreement in respect of all Transactions will be required to be made; and

(b)   the amount, if any, payable in respect of the Early Termination Date shall be determined pursuant to Section 6(e) of the Master Agreement.

On or as soon as reasonably practicable after the Early Termination Date, we will provide you with a statement as required under Section 6(d)(i) of the Master Agreement.

Sincerely,

**LCOR Alexandria L.L.C.**
By: LCOR PTO Headquarters LLC

By: _____
Name:  Richard O'Toole

2