Response Deadline:  **November 18, 2015**
Reply Deadline:  **December 16, 2015**
Hearing Date:  **January 7, 2016 at 10:00 a.m.**

Thomas J. Moloney
Boaz S. Morag
Mark E. McDonald
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

*Attorneys for Barclays Bank PLC and Barclays Capital Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS, INC.,<br><br>        Debtor. | Chapter 11 Case No.<br>08-13555 (SCC)<br>Jointly Administered |
| Lehman Brothers Holdings Inc., in its capacity as Plan Administrator on behalf of Itself and Lehman Brothers Special Financing Inc.,<br><br>        Plaintiff,<br><br>        -against-<br><br>LCOR Alexandria L.L.C., PTO Holdings LLC, The Related Companies Inc., Rosegreen Trust, Richard O'Toole, BW Realty Advisors LLC, Richard Gross, Barclays Bank PLC, and Barclays Capital, Inc.,<br><br>        Defendants. | Adversary Proc. No.<br>13-01689 (SCC) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**BARCLAYS BANK PLC AND BARCLAYS CAPITAL INC.'S**
**MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND ...................................................................................................................... 4

   A.   Lehman's Investment Banking And Swaps Relationships With LCOR Before The
Bankruptcy ............................................................................................................................4

   B.   Following LBHI's Bankruptcy Filing, Barclays Acquires LBHI's and LBI's North
American Investment Banking Business But Does Not Acquire Over-The-Counter
Derivatives Such As The LCOR-LBSF Swap .....................................................................6

   C.   LCOR Enters Into A Replacement Swap With Barclays In December 2008 ....................8

   D.   BWRA And Chatham – Not Barclays – Advise LCOR On Its Termination Of The
LCOR-LBSF Swap ............................................................................................................12

LEGAL STANDARD............................................................................................................... 14

ARGUMENT .......................................................................................................................... 15

   I.   The SAC Fails To State A Claim for Relief Against Barclays Based On Its Use Of
Information Related to LCOR .............................................................................................15

        A.   The SAC Fails To State A Claim For Breach Of The APA Or
Confidentiality Agreement (Count VII) ...................................................................15

            1.   The SAC Fails To Allege Any Breach By Barclays....................................15

            2.   The SAC Also Fails To Allege That Lehman's Damages Were
Proximately Caused By Barclays' Use Of LCOR-Related
Information ................................................................................................16

        B.   It Follows That The SAC Fails To State A Claim For Unfair Competition
By Misappropriation (Count VI) ..............................................................................17

        C.   The SAC Fails To State A Claim For Aiding And Abetting Breach Of
Fiduciary Duty (Count VII), Which Is Also Time-Barred .......................................18

   II.   The SAC Fails To State A Claim For Relief Based On Barclays' Entry Into The
Replacement Swap With LCOR .........................................................................................19

        A.   The SAC Fails To State A Claim For Conspiracy To Induce Breach of
Contract Against Barclays (Count IX) .....................................................................19

        B.   The SAC Fails To State A Claim For Unjust Enrichment Against Barclays
(Count V)..................................................................................................................21

            1.   The Master Agreement Precludes Recovery From Barclays ......................21

            2.   Barclays' Lack of Direct Dealings With LBSF Or Knowledge of
LCOR's Closeout Terms Also Necessitates Dismissal ..............................24

CONCLUSION....................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

CPLR 214(4) ................................................................................................... 19

**Cases**

Ashcroft v. Iqbal,
556 U.S. 662 (2009) ..................................................................................... 14

Barclays Capital Inc. v. Giddens (In re Lehman Bros. Inc.),
478 B.R. 570 (S.D.N.Y. 2012) ..................................................................... 15

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007) ..................................................................................... 14

Bigio v. Coca-Cola Co.,
675 F.3d 163 (2d Cir. 2012) ......................................................................... 14

Chambers v. Time Warner, Inc.,
282 F.3d 147 (2d Cir. 2002) ......................................................................... 15

Cumis Ins. Soc., Inc. v. E. F. Hutton & Co.,
457 F. Supp. 1380 (S.D.N.Y. 1978) ............................................................. 21

Diesel Props S.R.L. v. Greystone Bus. Credit II LLC,
631 F.3d 42 (2d Cir. 2011) ............................................................... 15, 16, 17

Georgia Malone & Co. v. Rieder,
19 N.Y.3d 511 (2012) ................................................................................... 25

Howe v. Bank of New York Mellon,
783 F. Supp. 2d 466 (S.D.N.Y. 2011) .......................................................... 23

In re Lehman Bros. Holdings Inc.,
445 B.R. 143 (Bankr. S.D.N.Y. 2011) ................................................... 6, 7, 8

In re LIBOR-Based Fin. Instruments Antitrust Litig.,
935 F. Supp. 2d 666 (S.D.N.Y. 2013) ...................................................... 24-25

ITC Ltd. v. Punchgini, Inc.,
9 N.Y.3d 467 (2007) ..................................................................................... 17

Kalyanaram v. Am. Ass'n of Univ. Professors at New York Inst. of Tech., Inc.,
742 F.3d 42 (2d Cir. 2014) ........................................................................... 15

Kaufman v. Cohen,
307 A.D.2d 113 (1st Dep't 2003) ........................................................... 18, 19

Kenneth D. Laub & Co. v. Bear Stearns Cos.,
262 A.D.2d 36 (1st Dep't 1999) ........................................................... 20

Marketxt Holdings Corp. v. Engel & Reiman, P.C.,
693 F. Supp. 2d 387 (S.D.N.Y. 2010) ...................................................... 18-19

MiniFrame Ltd. v. Microsoft Corp.,
No. 11 CIV. 7419 (RJS), 2013 WL 1385704 (S.D.N.Y. Mar. 28, 2013) ........... 18

Morgan Stanley & Co., Inc. v. Peak Ridge Master SPC Ltd.,
930 F. Supp. 2d 532 (S.D.N.Y. 2013) ...................................................... 21-23

Nemenyi v. Raymond Int'l, Inc.,
22 A.D.2d 657 (1st Dep't 1964) ........................................................... 20

New Earthshell Corp. v. Jobookit Holdings Ltd.,
No. 14-CV-3602 (JMF), 2015 WL 1000343 (S.D.N.Y. Mar. 5, 2015) ............... 16

Sit-Up Ltd. v. IAC/InterActiveCorp.,
No. 05 CIV. 9292 (DLC), 2008 WL 463884 (S.D.N.Y. Feb. 20, 2008) ............. 17

Toffel v. Odzer,
154 N.Y.S.2d 1002 (Sup. Ct. Nassau Cnty. 1956) ................................... 20

Yak v. Bank Brussels Lambert,
252 F.3d 127 (2d Cir. 2001) ................................................................ 15

**Other Authorities**

20 N.Y. Jur. 2d Conspiracy-Civil Aspects § 17 ....................................... 19, 20

Barclays Bank PLC and Barclays Capital Inc. (collectively "Barclays") respectfully submit this memorandum of law and the accompanying Declaration of Boaz S. Morag and attached exhibits in support of their motion to dismiss the Second Amended Complaint ("SAC") for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7012(b).[1]

## PRELIMINARY STATEMENT

This case is, as the Court put it, a "simple contract dispute" between Lehman Brothers Special Financing Inc. ("LBSF") and LCOR Alexandria L.L.C. ("LCOR") over the proper calculation of the termination amount on an interest-rate swap governed by an ISDA Master Agreement (the "Master Agreement").[2]  Barclays is not a party to that contract and should not be dragged into this dispute.  Barclays' only connection to this case is that it entered into a replacement swap with LCOR in December 2008, for which Barclays paid LCOR more than $15 million up front.  Critically, LCOR did not base its closeout with LBSF on that replacement transaction.  Moreover, that transaction with Barclays, which simply provided LCOR with more money to satisfy any obligation it might owe to LBSF, did not harm LBSF in any way and has nothing to do with this dispute.  Nevertheless, without any basis in law or logic, LBSF (together with Lehman Brothers Holdings Inc. ("LBHI"), "Lehman") now purports to assert five causes of action against Barclays.  Although the SAC was drafted with the benefit of full and unilateral document discovery from Barclays (as described below), each one of these claims falls far short of stating a claim for relief and should be dismissed.

---

[1]      Exhibits to the Morag Declaration are cited as "Ex. __."  Unless otherwise indicated, capitalized terms shall have the same meaning given to them in the SAC.

[2]      Ex. I at 113:21-22 (Corrected Tr. of Hr'g on Aug. 4, 2015).

*First*, the SAC asserts three claims against Barclays based on theories of unfair competition: (1) that Barclays "misused" confidential information related to LCOR that former employees of Lehman Brothers Inc. ("LBI"), who had come to Barclays in connection with its acquisition of LBHI's and LBI's North American investment banking business, had learned while at LBI, purportedly in breach of an Asset Purchase Agreement ("APA") and an earlier nondisclosure agreement (the "Confidentiality Agreement" and, together with the APA, the "Barclays Agreements") (Count VII); (2) that this "misuse[]" of LCOR-related information constitutes "unfair competition by misappropriation" (Count VI); and (3) that Barclays aided and abetted breaches of fiduciary duty the former LBI employees allegedly owed to LBI (Count VIII).  These claims fail for at least two reasons: (a) Barclays' use of LCOR-related information was permitted under the Barclays Agreements and was not otherwise improper, and, (b) even if that were not the case (and it is), LBSF, which was no longer in the business of acting as a new or continuing swaps party after its bankruptcy (and therefore not competing against Barclays for the replacement swap with LCOR), was not injured by anything Barclays did.  Furthermore, the aiding and abetting breach of fiduciary duty claim is also time-barred.

*Second*, the SAC asserts claims against Barclays for conspiracy to induce LCOR's alleged breach of the Master Agreement with LBSF (Count IX) and unjust enrichment (Count V).  These claims are based on the allegation that Barclays' $15.6 million upfront payment to LCOR for the replacement swap was too low and therefore constituted a "windfall" to Barclays "at Lehman's expense."  SAC ¶¶ 64, 124-27, 142-44.  Barclays, however, had no obligation to pay LBSF and, because LCOR did not rely in any way on the bid it received from Barclays for its own calculation of the termination amount, Barclays' bid for the trade did not cause LCOR to breach the Master Agreement.  Indeed, the SAC offers no explanation why LCOR would not

2

have sought to obtain the most money possible from Barclays or any other dealer for the replacement trade.  Furthermore, the premise of the SAC is that LCOR intended to pocket any upfront payment and not disclose any bid to Lehman, such that LCOR would have breached its contract with LBSF regardless of what consideration it received.

Moreover, while Barclays disputes Lehman's unsubstantiated contention that the LCOR-Barclays transaction was a "plain vanilla swap" justifying a $40 million upfront payment to LCOR,[3] even assuming it was, the fact that LCOR entered into a bad deal with Barclays does not impair Lehman's claim against LCOR or provide Lehman with any rights against Barclays. New York law is clear, as this Court recognized in Lehman Brothers Holdings Inc. v. Raymond James Financial, Inc.,[4] that where a party (LBSF) is owed a closeout payment from its counterparty (LCOR), the party may not recover based on a claim of unjust enrichment or otherwise from a non-party (Barclays) based on the non-party's allegedly commercially unreasonable payment to the counterparty for a replacement transaction.  Such a claim against a non-party is "within the subject matter of the contract," and therefore the party's sole remedy is a claim for breach of contract against its counterparty.

Accordingly, the SAC fails to state any claim for relief against Barclays and should be dismissed with prejudice.

---

[3]    The SAC alleges that "[t]he actual mid-market value" of the swap with LCOR on the date Barclays and LCOR entered into the replacement transaction was $39,561,804, id. ¶ 63, but this amount appears to fail to account for the substantial credit risk of this non-collateralized transaction, particularly in the eight years that the swap would continue past the expiration date of the lease that provided the only security for LCOR's counterparty.  See infra at 5, 10.  Although not an issue the Court need resolve on this motion given Lehman's failure to address Barclays' internal valuation of the swap despite having such information when it drafted the SAC, see infra footnote 5, Barclays strenuously contests the SAC's allegations that Barclays made an inadequate cash payment to LCOR and, by implication, retained approximately $24 million in "windfall" profit (the difference between $15.6 million paid by Barclays and the $39.6 million value of the projected cash flows).  See SAC ¶ 64.

[4]    See Order Granting in Part and Denying in Part Raymond James Financial, Inc. and RJ Capital Services, Inc.'s Motion to Dismiss Complaint, Lehman Brothers Holdings Inc. v. Raymond James Financial, Inc. (In re Lehman Bros. Holdings Inc.), Adv. Proc. No. 14-02243 (SCC) (Bankr. S.D.N.Y. Mar. 10, 2015), ECF No. 27 ("Raymond James").

# BACKGROUND

The following facts are taken from the SAC, whose well-pled factual allegations Barclays accepts as true solely for purposes of this motion, and the documents the SAC incorporates by reference, as well as undisputed facts about this bankruptcy case that are subject to judicial notice.  The Court may consider all of these sources for purposes of deciding this motion.  See infra at 15.  The events giving rise to the SAC occurred seven years ago, and Lehman has had Barclays' documents, on which it admittedly relied in drafting the SAC, for four years before joining Barclays to this suit.[5]  Accordingly, unlike a typical trustee, who is presumed to have no knowledge of the relevant facts, Lehman should not be given any pleading leeway.

### A.    Lehman's Investment Banking And Swaps Relationships With LCOR Before The Bankruptcy

LCOR was formed by LBI as a special purpose vehicle "to facilitate the design, development, construction and leasing" of the United States Patent and Trademark Office's five-building office complex in Alexandria, Virginia (the "USPTO Complex").  SAC ¶ 33.  To finance this project, LCOR issued a series of bonds in December 2001 in an initial aggregate amount of $761.3 million (the "LCOR Bonds"), of which $580 million were Select Auction Variable Rate Securities ("SAVRS") and $181.3 million were fixed-rate bonds.[6]

---

[5]    As described in the Morag Declaration, in response to a letter request for documents from Lehman, Barclays produced the nearly 3,000 pages of emails, contracts, and other documents related to the replacement swap with LCOR in its files in October 2010.  In addition, in response to a third-party subpoena from Lehman, in November 2014 Barclays produced additional documents showing its actual profit and loss on the swap.  Although the SAC selectively ignores the 2014 documents, presumably because they disprove Lehman's repeated, conclusory allegation that Barclays reaped a "windfall," see supra footnote 3, it does incorporate a number of the documents Barclays produced, including 17 documents Lehman specifically referred to in seeking Barclays' consent to file the SAC publicly.

[6]    See Ex. A at -2452 (March 2007 Presentation); Ex. B at -2466 (Information Sheet); Ex. C (Trust Agreement); Ex. D at -1953 (Reoffering Memorandum).

Under a Trust Agreement between LCOR and Trustee Bankers Trust Company
(later Deutsche Bank Trust Company Americas),[7] the LCOR Bonds were backed by rent
payments made by the United States government under the leases for the USPTO Complex.  See
Ex. C at p.2 (Trust Agreement); id. at p.21; Ex. B at -2466 (Information Sheet).  LBI acted as
LCOR's investment banker and broker-dealer in connection with issuing the LCOR Bonds.  See,
e.g., Ex. C § 7.26 (Trust Agreement); id. § 12.11; id. at p.23.

At the same time that it issued the LCOR Bonds in December 2001, LCOR and
LBSF entered into interest-rate swaps to hedge LCOR's exposure to the variable interest rates on
the $580 million SAVRS.  See SAC ¶ 32; Ex. A at -2452 (March 2007 Presentation).  The swaps
were governed by the Master Agreement entered into as of December 13, 2001.  See Ex. E
(LCOR-LBSF ISDA Master Agreement).  The obligation of LCOR to make payments to LBSF
under the Master Agreement was secured by the U.S. government lease payments, on a parity
with the LCOR Bonds.  See id. at Schedule Part 4(a)(ii)(c).  LCOR, however, was not required to
post any collateral to LBSF to secure its payment obligations.  See id. at Credit Support Annex ¶
13(m).  Thus, in the absence of collateral, LBSF was dependent on the U.S. government
continuing to make rent payments under the USPTO Complex leases in order to obtain the
benefit of its bargain under the swaps.

In 2004, LCOR and the U.S. government entered into a 20-year lease, the
maximum lease term allowed by statute.  See Ex. B at -2468 (Information Sheet); Ex. D at -1956
(Reoffering Memorandum).  In 2005, LCOR converted $60,200,000 of the SAVRS to bonds
with a Special Floating Rate equal to three-month LIBOR plus 23 basis points (as converted, the
"LIBOR Bonds"), with a maturity date of December 15, 2032, eight years *after* the expiration of

---

[7]        See Ex. D at -1953 (Reoffering Memorandum).

the USPTO Complex leases in 2024.  See id. at -1953-54; Ex. B at -2466.  LBI acted as

Placement Agent for this reoffering.  Ex. D at -1953.  The remainder of the $580 million SAVRS

were converted to fixed-rate bonds, and the associated interest-rate swaps with LBSF were

terminated.  See Ex. B at -2466.  In 2006, LBI sold LCOR to an affiliate of Rosegreen, in

connection with which LCOR issued additional subordinated bonds.  Id.

In connection with the conversion of $60,200,000 SAVRS to the LIBOR Bonds,

LCOR and LBSF entered into a new interest-rate swap documented in the Fourth Amended and

Restated Confirmation pursuant to the Master Agreement, dated as of March 30, 2005.  SAC ¶¶

32-33.  Under this new swap (the "LCOR-LBSF Swap"), LBSF agreed to pay LCOR the same

floating rate (three-month LIBOR plus 23 basis points) that LCOR paid on the LIBOR Bonds on

a notional amount of $60,200,000 until the LIBOR Bonds matured in 2032.  Id.  In return, LCOR

agreed to pay LBSF a fixed rate of 6.8005%.  Id.

**B.      Following LBHI's Bankruptcy Filing, Barclays Acquires LBHI's and LBI's
         North American Investment Banking Business But Does Not Acquire Over-
         The-Counter Derivatives Such As The LCOR-LBSF Swap**

LBHI filed for bankruptcy protection on Monday, September 15, 2008.  SAC ¶

36.  Over the previous weekend, Barclays and LBHI had engaged in negotiations over a potential

sale of LBHI's global business to Barclays (which would have included the LCOR-LBSF Swap),

but those negotiations fell through when Barclays informed LBHI of its inability to consummate

such a transaction.  See In re Lehman Bros. Holdings Inc., 445 B.R. 143, 169 (Bankr. S.D.N.Y.

2011).

In connection with those pre-bankruptcy filing negotiations, Barclays and LBHI

entered into the Confidentiality Agreement dated September 11, 2008 to govern "Confidential

Information" provided to Barclays as part of its due diligence.  See SAC ¶ 36. "Confidential

Information" was defined as "non-public information . . . relating to [LBHI's] business which [it]

6

deems confidential and proprietary" that LBHI "furnish[ed]" to Barclays "in connection with

Barclays' consideration" of the potential purchase of LBHI.  Ex. F (Confidentiality Agreement).

The SAC does *not* allege that any information regarding the LCOR-LBSF Swap was furnished to

Barclays as part of its due diligence.

      Following LBHI's bankruptcy filing on September 15, Barclays and LBHI began

discussing an alternative narrower transaction in which Barclays would acquire the assets of

LBHI's and LBI's North American investment banking and broker-dealer business.  In re

Lehman, 445 B.R. at 169.  These discussions culminated in the signing of the APA in the early

morning hours of September 16, 2008.  Id.; SAC ¶ 36.  In the APA, Barclays agreed to purchase

"all of the assets of [LBHI, LBI, and LB 745 LLC] used in connection with the Business

(excluding the Excluded Assets)."  Ex. G at p.6.  "Business" was further defined as "the U.S. and

Canadian investment banking and capital markets businesses of [LBHI and LBI] including the

fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses,

investment banking operations and LBI's business as a futures commission merchant."  Id. at

p.2.  Among "Excluded Assets" were "all assets primarily related to . . . derivatives contracts,"

including the LCOR-LBSF Swap.  Id. at p.4; SAC ¶ 37.

      Barclays also agreed to offer employment to LBI employees who worked

"primarily in connection with the Business," see Ex. G § 9.1(a) (APA), and to pay them certain

salary, bonus, or severance amounts, see id. §§ 9.1(b), (c), which saved thousands of jobs and

benefited the estate.  See In re Lehman, 445 B.R. at 154 ("The transaction included offers of

employment to most members of the Lehman work force that not only helped these individuals

at a most difficult time on Wall Street, but also unquestionably was good for the estate,

brokerage customers and the general economy.").  As the Court acknowledged at the hearing to

approve the transaction, part of what Barclays was buying were the "rolodexes" of LBI's employees – i.e., their client relationships.[8]

LBHI and LBI agreed in the APA that before the closing, Barclays "shall be entitled . . . to make such investigation of the properties, businesses and operations of the Business and such examination of the books and records of the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests . . . ." Ex. G § 8.1. The APA also provided that "Confidential Information provided to [Barclays] in connection with this Agreement, including under Section 8.1, and the consummation of the transactions contemplated hereby," would be subject to the Confidentiality Agreement that had been executed before the bankruptcy filing, which was incorporated into the APA by reference. Id. § 8.6 (APA); SAC ¶ 36. However, effective upon closing, the Confidentiality Agreement would "terminate with respect to information relating solely to the Business or otherwise included in the Purchased Assets." Id. In other words, as to Excluded Assets such as the LCOR-LBSF Swap, only the particular confidential information that Barclays *obtained for purposes of diligence* (i.e., "investigation . . . of the Business") remained subject to the September 11, 2008 Confidentiality Agreement going forward.

Following a lengthy hearing, this Court approved the sale to Barclays, which then closed on Monday, September 22, 2008. In re Lehman, 445 B.R. at 161; SAC ¶ 37. On the same day, thousands of former LBI employees became Barclays employees. Id. ¶ 45.

### C.    LCOR Enters Into A Replacement Swap With Barclays In December 2008

After the APA was signed and filed with the Court, the LBI investment bankers who worked with LCOR realized that because Barclays was not assuming LBSF's over-the-

---

[8]    See Tr. of H'rg on Sept. 19-20, 2008 at 48:21-24, In re Lehman Bros. Holdings Inc., Case No. 08-13555 (Bankr. S.D.N.Y.), ECF No. 318.

counter swaps, LCOR (like numerous other LBSF counterparties) would need to enter into a replacement swap with a new dealer to continue to hedge its interest rate exposure on the LIBOR Bonds.  See SAC ¶ 48.  These same employees, knowing that they, along with the investment banking business related to the LCOR Bonds, were going to Barclays in the asset sale, also expected that Barclays would be a natural choice of replacement counterparty for LCOR, particularly given the complicated background and credit risk associated with the swap with which the LBI employees were already familiar.  See SAC ¶ 47 (alleging on September 18, 2008, Edward Fanter, a LBI investment banker, discussed with Richard Gross, LCOR's financial advisor, replacing the LBSF Swap with a new swap with Barclays).[9]

After the Barclays acquisition closed on September 22, the former LBI employees now at Barclays "actively sought to gain LBSF's standing in the Swap" in competition with every other swaps dealer, although not in competition with Lehman which was no longer in the swaps business.  SAC ¶¶ 49, 57.  To that end, between September and December 2008, the former LBI employees reviewed the background documents discussed in Part A above concerning the underlying LCOR Bonds and USPTO Complex leases, which related to the "Business" that Barclays acquired and were relevant to Barclays' internal evaluation of the credit risk associated with the swap, which in turn reflected the price Barclays was willing to pay to provide the swap.  Id. ¶¶ 48, 56.

Meanwhile, LCOR retained its own advisors, BWRA and Chatham, to assist it in connection with closing out the LCOR-LBSF Swap.  See id. ¶¶ 74 ("As early as September

---

[9]        Lehman notes that, when informed by Fanter of this conversation, Stephan Howard, another LBI investment banker, immediately responded: "Good, the gift that keeps on giving."  Id.  In context, the "gift" was an obvious reference to the fact that the terms of the asset sale gave Barclays a potential for new business with LCOR and every other LBSF swaps counterparty that needed to find a replacement dealer – and was not a specific reference to the replacement swap between Barclays and LCOR (as Lehman insinuates) which would not be consummated for another several months.  See id. ¶ 3.

2008, BWRA had begun to analyze LCOR's options regarding the Swap in light of the LBHI

bankruptcy."). See also id. ¶¶ 50, 51, 76. Chatham "reached out to a number of potential

counterparties to assess their interest in stepping in as a replacement swap provider," and as of

mid-November 2008 "had established that JPMorgan, Bank of America, and Bank of New York-

Mellon would pass on the deal . . . [and] was still waiting to hear from Goldman Sachs, Merrill

Lynch, Deutsche Bank, and HSBC." Id. ¶ 57. Barclays believed that it faced potential

competition for the replacement swap with LCOR. See id. ¶ 55 ("On November 10, 2008, Fanter

wrote to Wolanski, '[l]et's try to wrap this up as soon as we can,' noting 'they [LCOR] did hire a

swap advisor to get quotes.'").[10]

On December 8, 2008, LCOR entered into a new interest-rate swap with Barclays

(the "Barclays Swap"). Id. ¶ 61. LCOR sought, and Barclays agreed to, essentially the same

terms as the LCOR-LBSF Swap, with Barclays in the place of LBSF: Barclays agreed to pay a

floating rate of LIBOR plus 23 basis points in exchange for receiving a fixed rate of 6.8005% on

a notional amount of $60,200,000 until 2032. LCOR's payment obligations were secured only

by the lease payments in connection with the USPTO Complex. Barclays paid LCOR

$15,640,000 up front for the Barclays Swap because the 6.8005% fixed rate of interest that

LCOR would be paying through 2032 was substantially higher than the prevailing interest rate.[11]

In the confirmation documenting the Barclays Swap (the "Barclays

Confirmation"), LCOR represented and warranted that it was "not relying on the advice of

[Barclays] for legal, accounting, tax or investment matters," but rather "ha[d] sought and [wa]s

---

[10]    The SAC alleges that "Deutsche Bank expressed interest in being a replacement swap provider," but did
not submit a bid when LCOR refused to provide further documentation regarding the swap structure. SAC ¶ 58.
The SAC does not allege that Barclays was even aware of LCOR's alleged refusal to share information with
Deutsche Bank or that Deutsche Bank did not submit a bid.

[11]    According to the SAC, this price paid by Barclays was consistent with the internal "indicative valuation[]"
Chatham provided LCOR in November 2008. SAC ¶ 54 (Chatham indicatively valued the swap at $19,150,000 in-
the-money to the party in LBSF's shoes).

relying on the advice of its own professionals and advisors for such matters and ha[d] made an

independent analysis and decision regarding the determination to enter into this Transaction on a

negotiated basis on such advice." Ex. H ¶ 7. LCOR also represented that it had elected to enter

into the swap with Barclays on a negotiated basis rather than soliciting competitive bids, and that

LCOR "ha[d] determined, without reliance upon [Barclays], the economic risks and merits, as

well as the legal . . . consequences . . . of its determination to enter into this Transaction on a

negotiated basis and is capable of assuming such risks." Id.; SAC ¶ 62.

        As stated in the Barclays Confirmation, the upfront payment by Barclays (Party

A) to LCOR (Party B) was to be made to an "account of [LCOR]" at Bank of America under the

name "PTO Holdings LLC":

**6.  Upfront Payment:**

Party A shall pay to Party B USD 15,640,000 (the "Upfront Payment") on December 10, 2008 and such
amount is reflected in, and has increased, the Fixed Rate to be paid by Party B to Party A hereunder.
The Upfront Payment shall be transferred by Party A to the following account of Party B:

|  |  |
|---|---|
| Account Name: | PTO Holdings LLC |
| Account Number: | 004606932662 |
| Bank Name: | Bank of America |
| ABA: | 026009593 |

Ex. H ¶ 6; SAC ¶ 65. Accordingly, on December 15, 2008, Barclays wired the funds into that

account. Id. ¶ 66. Although the SAC alleges LCOR instructed Barclays to pay PTO Holdings in

an effort to avoid "bankruptcy risk," there is no logical reason why transferring the money to

PTO Holdings pursuant to a written confirmation identifying LCOR as the beneficiary of the

transfer hid those funds from Lehman. In fact, it did not.[12]

---

[12]        The SAC contains no allegation that paying PTO Holdings has put that money out of Lehman's reach.
Indeed, the SAC asserts a conversion claim against PTO Holdings over its retention of those funds, see id. ¶¶ 119-
22, and counsel for Lehman acknowledged at the August 4, 2015 hearing in this adversary proceeding that the
majority of the $15 million is still sitting in a PTO Holdings account. Ex. I. at 85:15-86:6 (Corrected Tr. of Hr'g on
Aug. 4, 2015).

### D.   BWRA And Chatham – Not Barclays – Advise LCOR On Its Termination Of The LCOR-LBSF Swap

According to the SAC, one day after entering into the Barclays Swap, LCOR hand-delivered to LBSF a termination notice on December 9, 2008, which designated December 16, 2008 as the "Early Termination Date" under the Master Agreement.  SAC ¶ 38.  On December 19, 2008, LCOR submitted to LBSF a calculation statement "purportedly prepared under Section 6(d)(i) of the Master Agreement."  Id. ¶ 89.  The calculation statement asserted that Chatham was unable to obtain quotes from any Reference Market Maker with respect to the terminated swap as contemplated by the Master Agreement's Market Quotation measure and, "based on Loss, LBSF owed LCOR a payment of $6,712,965.06 as a result of LCOR's early termination of the Swap."  Id.  See also id. ¶¶ 39-41 (describing Master Agreement closeout provisions).  The SAC alleges this calculation statement was false and misleading because Chatham had not conducted a bona fide process to elicit quotes and because it ignored the Barclays Swap for which LCOR had received an upfront payment of $15.6 million.  Id. ¶ 89.

According to the SAC, BWRA came up with the idea for LCOR to submit a calculation statement which did not even mention the Barclays Swap and which asserted a loss even though Barclays paid LCOR $15.6 million, and it was BWRA who "'identified the proposition that, in the absence of four market quotations for a replacement swap, the alternate 'loss' methodology under the ISDA swap agreement could allow the owner to identify a loss of 'benefit of the bargain' regardless of whether a replacement swap provider would pay [LCOR] to enter into such a swap.'"  Id. ¶ 4.  See also id. ¶¶ 53, 75.[13]  Implementing this plan, Chatham

---

[13]   Lehman recently filed two adversary complaints similarly alleging that its swap counterparty deliberately failed to obtain market quotes and claimed Loss from LBSF.  See Adv. Proc. Compl., Lehman Bros. Holdings Inc. v. Presbyterian Seniorcare (In re Lehman Bros. Holdings Inc.), Adv. Proc. No. 15-01300 (SCC) (Sept. 15, 2014), ECF No. 1; Adv. Proc. Compl., Lehman Bros. Holdings Inc. v. Longwood at Oakmont, Inc. (In re Lehman Bros. Holdings Inc.), Adv. Proc. No. 15-01299 (SCC) (Sept. 15, 2014), ECF No. 1.  Notably, although KSR Capital

allegedly "manipulate[d] the contractually mandated market quotation process into failure." Id. ¶ 5. See also id. ¶¶ 76-88.

The SAC does *not* allege – because it cannot – that Barclays participated in the conception or preparation of the calculation statement or in the allegedly sham quotation process. Instead, the SAC alleges that Barclays "assisted" LCOR and its advisors in their preparation of the false and misleading calculation statement in two ways:  first, by wiring the $15.6 million payment to the PTO Holdings account, id. ¶ 65, and, second, by providing LCOR a quote for an interest rate cap, id. ¶ 91.  But, as to both, the SAC alleges Barclays simply followed LCOR's request.  See id. ¶ 61 (alleging Barclays "complied with LCOR's scheme to redirect the funds to PTO Holdings"); id. ¶ 125 (alleging Barclays provided LCOR "a purported quote to support LCOR's theoretical cost of a hypothetical interest rate cap").  In any event, the SAC does not contain any non-conclusory allegation that Barclays was aware that LCOR had a nefarious purpose with respect to either request.  See id. ¶ 65 ("*LCOR inserted* [the PTO Holdings account] provision to ensure the Barclays Swap Proceeds would be diverted to PTO Holdings without any 'bankruptcy risk.'  Seemingly, *LCOR believed* that by funneling the Barclays Swap Proceeds through an entity other than itself, it could avoid having to pay these amounts over to LBSF" (emphasis added)); id. ¶ 91 (conclusory allegation that Barclays assisted LCOR in closing out its swap with Lehman by providing a quote for an interest rate cap, but no factual allegation that Barclays was involved at all in, or even aware of, LCOR's calculation statement incorporating that quote submitted to LBSF).

In any event, the SAC alleges that at the time of termination Lehman was entitled under the Master Agreement to an early termination payment from LCOR reflecting "the value

---

(unlike Barclays here) is alleged to have advised Lehman's counterparty to follow this scheme in both cases, it is not a defendant in either.  See id.

of the terminated Swap as determined on the basis of Market Quotation (or Loss, *if Market Quotation failed or did not produce a commercially reasonable result*)." SAC ¶ 43 (emphasis added). Thus, as the SAC also alleges, even if the amount paid by Barclays fell "short of a commercially reasonable value of the terminated Swap between LCOR and [Lehman]," SAC ¶ 63, LCOR remains obligated to pay a Settlement Amount that is reasonable and determined in good faith. See SAC ¶ 113 ("As a result of [LCOR's breach of the Master Agreement], LBSF has been damaged in an amount to be proven at trial, *representing the value of the Swap on the Early Termination Date (plus the Unpaid Amounts), together with contractual interest*." (emphasis added)).

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead sufficient "facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Thus, the complaint must do more than aver facts that are "merely consistent with a defendant's liability," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted); at a minimum, it must advance sufficient factual allegations to "nudge[] [its] claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570. In assessing the plausibility of a plaintiff's claims, the court should not credit "labels and conclusions," or "naked assertions devoid of further factual enhancement." Iqbal, 556 U.S. at 678. Accordingly, the court should begin its analysis by identifying any conclusory allegations not entitled to the presumption of truth. See Iqbal, 556 U.S. at 679; Bigio v. Coca-Cola Co., 675 F.3d 163, 173-74 (2d Cir. 2012). Once these allegations are shorn from the complaint, the court should then determine whether the remaining factual allegations state a plausible claim for relief. Iqbal, 556 U.S. at 679.

14

In carrying out this analysis, the court may consider the complaint, any materials incorporated by reference in or integral to the complaint, and any documents subject to judicial notice.  See, e.g., Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002); Yak v. Bank Brussels Lambert, 252 F.3d 127, 130-31 (2d Cir. 2001).[14]

## ARGUMENT

### I.   THE SAC FAILS TO STATE A CLAIM FOR RELIEF AGAINST BARCLAYS BASED ON ITS USE OF INFORMATION RELATED TO LCOR

The SAC's three causes of action against Barclays based on its alleged misuse of confidential LCOR-related information – for breach of contract, unfair competition by misappropriation, and aiding and abetting breach of fiduciary duty – all fail to state a claim.

### A.   The SAC Fails To State A Claim For Breach Of The APA Or Confidentiality Agreement (Count VII)

The breach of contract claim should be dismissed because Lehman fails to allege, as it must, that Barclays breached any contractual obligation or proximately caused Lehman any damages.  Diesel Props S.R.L. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011).

#### 1.   The SAC Fails To Allege Any Breach By Barclays

Written contracts are interpreted according to the parties' intent, which is "derived from the plain meaning of the language employed in the agreements."  Barclays Capital Inc. v. Giddens (In re Lehman Bros. Inc.), 478 B.R. 570, 586 (S.D.N.Y. 2012).  By its terms, the Confidentiality Agreement covered only proprietary information "furnished to [Barclays] . . . in connection with Barclays' consideration of a potential investment in or transaction with [LBHI]," i.e., during due diligence – which lasted only one weekend.  Ex. F (Confidentiality

---

[14]      On this motion, therefore, the documents properly before the Court include the SAC; the relevant contracts including the Master Agreement, confirmations, the APA, and the Confidentiality Agreement; documents Lehman itself has admitted it relied on and are thus incorporated in the SAC; and widely known and indisputable facts concerning this bankruptcy case of which the Court can take judicial notice.  See Kalyanaram v. Am. Ass'n of Univ. Professors at New York Inst. of Tech., Inc., 742 F.3d 42, 44 n.1 (2d Cir. 2014).

Agreement); see supra at 6-7.  The APA, which incorporates the Confidentiality Agreement by reference, further emphasizes that as to assets Barclays was *not* acquiring the confidentiality obligation continues only with respect to information "provided to [Barclays]" in connection with due diligence. Ex. G § 8.6(a) (APA).

The SAC does not allege, because it cannot, that Barclays received *any* information relating to LCOR in these compressed due diligence periods.  At most, the SAC alleges that certain former LBI employees relied upon their own knowledge of LBI's investment banking relationship with LCOR (which was a Purchased Asset) and accessed their own files from their time at LBI *after the closing* to facilitate a new swap between Barclays and LCOR. See SAC ¶¶ 46-48, 56, 138.  The SAC thus fails to allege a breach of the APA or Confidentiality Agreement.  See New Earthshell Corp. v. Jobookit Holdings Ltd., No. 14-CV-3602 (JMF), 2015 WL 1000343, at *5 (S.D.N.Y. Mar. 5, 2015) (dismissing complaint where contract did not prohibit defendant from engaging in conduct alleged to constitute breach).

### 2. The SAC Also Fails To Allege That Lehman's Damages Were Proximately Caused By Barclays' Use Of LCOR-Related Information

Lehman's breach of contract claim based on Barclays' use of LCOR information further fails for the independent reason that the SAC does not allege that Lehman was directly and proximately injured by such use.  "Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages." Diesel Props, 631 F.3d at 52-53.

At most, the SAC alleges that by using the LCOR-related information, Barclays gained an informational advantage over other swaps dealers who did not have such information. See SAC ¶ 58 (alleging LCOR "refused to share with Deutsche Bank the transaction documents that the Barclays employees had access to as former Lehman employees" and thus "Deutsche

Bank was unable to price the trade and make a competitive bid"). But Lehman does not allege –

nor could it – that *it* was in competition with Barclays for the new swap because, by Lehman's

own allegations, the new swap was a replacement resulting from Lehman's own default, and

Lehman's bankruptcy meant that it was out of the swaps business. See, e.g., id. ¶ 3. Thus, all

the SAC plausibly alleges is that Barclays' use of information harmed other swaps dealers, not

LBSF. In any event, Lehman admits that LCOR possessed the same transaction-related

documents that the former LBI employees at Barclays possessed, and alleges that LCOR decided

(independently of Barclays) not to share such documents with other swaps dealers. See id. ¶ 58.

Thus, Barclays' use of LCOR's information that LCOR already possessed to enter into a

transaction with LCOR was not the proximate cause of any injury to Lehman.[15]

### B.    It Follows That The SAC Fails To State A Claim For Unfair Competition By Misappropriation (Count VI)

Lehman's claim for unfair competition by misappropriation based on the same

alleged conduct likewise fails. "Under New York law, an unfair competition claim involving

misappropriation usually concerns the taking *and use* of the plaintiff's property *to compete*

*against the plaintiff's own use* of the same property." ITC Ltd. v. Punchgini, Inc., 9 N.Y.3d 467,

478 (2007) (emphasis added). Because Barclays' use of the LCOR-related information was

permitted by the Barclays Agreements, it did not constitute "misappropriation." See Sit-Up Ltd.

v. IAC/InterActiveCorp., No. 05 CIV. 9292 (DLC), 2008 WL 463884, at *20-21 (S.D.N.Y. Feb.

20, 2008) ("Imposing any restrictions broader than those imposed by the NDA on defendants'

commercial activity through the doctrine of unfair competition is unwarranted."). Nor is there

any unfair competition because the SAC does not allege that Barclays' use of the information (to

---

[15]    See Diesel Props, 631 F.3d at 53 ("Recovery [for breach of contract] is not allowed if the claimed losses are the result of other intervening causes.").

enter into a new swap with LCOR) competed against Lehman's own use of that information, which LCOR also possessed and thus could have made available to other swaps dealers, as Lehman in fact alleges it should have done. See SAC ¶ 58. Accordingly, this claim should be dismissed. See MiniFrame Ltd. v. Microsoft Corp., No. 11 CIV. 7419 (RJS), 2013 WL 1385704, at *8 (S.D.N.Y. Mar. 28, 2013) (dismissing unfair competition claim where complaint acknowledged that defendant "may have otherwise obtained" allegedly misappropriated information from a source other than plaintiff).

**C.   The SAC Fails To State A Claim For Aiding And Abetting Breach Of Fiduciary Duty (Count VII), Which Is Also Time-Barred**

The aiding and abetting breach of fiduciary duty claim also fails for similar reasons. "A claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." Kaufman v. Cohen, 307 A.D.2d 113, 125 (1st Dep't 2003). Because Barclays' use of the LCOR-related information was permitted under the Barclays Agreements, by which Barclays purchased LBHI's and LBI's "Business" and agreed to employ and compensate former LBI employees, Barclays could not have "knowingly induced or participated" in such former LBI employees' breach of fiduciary duty by allowing them to do that which the APA permitted them to do. See id. at 125-26 (plaintiff must allege facts showing that defendant had "actual knowledge" as opposed to mere constructive knowledge of the breach of duty and that "he or she provide[d] 'substantial assistance' to the primary violator"). Additionally, as with the breach of contract claim, this claim should be dismissed for failure to plead that any such breach caused damage to Lehman.

The aiding and abetting breach of fiduciary duty claim is also untimely and must be dismissed for this independent reason. The statute of limitations on an aiding and abetting

claim is determined by that of the underlying tort. Marketxt Holdings Corp. v. Engel & Reiman, P.C., 693 F. Supp. 2d 387, 393 (S.D.N.Y. 2010). There is no "single limitations period for breach of fiduciary duty claims. Generally, the applicable statute of limitations for breach of fiduciary duty claims depends on the substantive remedy sought." Kaufman, 307 A.D.2d at 118. "Where suits alleging a breach of fiduciary duty seek only money damages, courts have viewed such actions as alleging 'injury to property,' to which a three-year statute of limitations applies." Marketxt Holdings Corp., 693 F. Supp. 2d at 398; see also CPLR 214(4). Because the SAC seeks only money damages on the aiding and abetting breach of fiduciary duty claim, SAC at p.41, the three-year statute of limitations applies. The SAC alleges no tortious conduct by Barclays after December 2008, nor does it allege that the statute of limitations was tolled. Thus, because Lehman did not sue Barclays until December 2014, long after the three-year limitations period expired, the aiding and abetting claim is time-barred.

## II.  THE SAC FAILS TO STATE A CLAIM FOR RELIEF BASED ON BARCLAYS' ENTRY INTO THE REPLACEMENT SWAP WITH LCOR

The two remaining claims against Barclays for conspiracy to induce breach of contract and unjust enrichment both rest on the same conclusory allegations that Barclays underpaid for the replacement swap with LCOR and assisted LCOR in its alleged failure to pay LBSF a reasonable closeout amount. Neither states a claim for relief against Barclays.

### A.  The SAC Fails To State A Claim For Conspiracy To Induce Breach of Contract Against Barclays (Count IX)

Under New York law, "there is no cause of action for conspiracy to breach a contract—as distinguished from an action for conspiracy to *induce* breach of contract." 20 N.Y. Jur. 2d Conspiracy-Civil Aspects § 17 at n.5 (emphasis added) (citing Smith v. Fitzsimmons, 180 A.D.2d 177, 180-81 (3d Dep't 1992)). Thus, the plaintiff must plead a conspiracy among two or more *non*-contract parties (to induce the contract party to breach); where the contract party is the

19

only other party alleged to have participated in that conspiracy, there is no claim for conspiracy

to induce breach of contract, and all that is alleged is tortious interference with contract.[16]  See

Toffel v. Odzer, 154 N.Y.S.2d 1002, 1004 (Sup. Ct. Nassau Cnty. 1956).  Here, the SAC

purports to allege a conspiracy between Barclays and LCOR for the purpose of enabling LCOR

to breach its own contract with LBSF.  See SAC ¶ 143 (alleging Barclays "induced and aided

LCOR in violating the ISDA Master").  Nowhere in the SAC is Barclays alleged to have joined a

conspiracy with any party other than LCOR, much less for the specific purpose of inducing

LCOR to breach its contract with LBSF.  This ground alone necessitates dismissal of the

conspiracy to induce breach of contract claim.

       In addition, the claim also fails because the SAC alleges no facts plausibly

supporting the inference that Barclays was the moving force here and *induced* LCOR's breach of

the Master Agreement.  See Raymond James at 6 ("[A claim for conspiracy to induce breach of

contract] 'requires a defendant who is not a party to the contract who induces one of the parties

to the contract to breach.'" (citing Carvel v. Franchise Stores Realty Corp., No. 08 Civ. 8938

(JGK), 2009 WL 4333652, at *7 (S.D.N.Y. Dec. 1, 2009)); Nemenyi v. Raymond Int'l, Inc., 22

A.D.2d 657 (1st Dep't 1964) (dismissing conspiracy to induce breach of contract claim where

"there are no allegations which could support a contention that defendants actively participated

in persuading Pfister to breach his agreement with plaintiffs"); 20 N.Y. Jur. 2d Conspiracy-Civil

Aspects § 17 ("The mere acquiescence by a person in the breach of a contract by another is not a

sufficient foundation for a conspiracy action.").

       Although the SAC contains detailed allegations that Chatham and BWRA advised

LCOR on its closeout, see, e.g., SAC ¶ 4, 5, critically, the SAC does *not* allege that Barclays

---

[16]     No tortious interference with contract claim is asserted in the SAC.  In any event, such claim would be
time-barred.  See Kenneth D. Laub & Co. v. Bear Stearns Cos., 262 A.D.2d 36 (1st Dep't 1999) (affirming dismissal
of tortious interference with contract claim based on three-year statute of limitations).

provided any advice to LCOR (or that LCOR followed Barclays' advice), as LCOR's no-reliance representations in the Barclays Confirmation demonstrate. See supra at 10-11. The only allegations regarding Barclays' participation in LCOR's closeout are (1) that it wired funds to PTO Holdings LLC and (2) that it provided a quote for an interest rate cap[17] – but the SAC alleges that Barclays did both at LCOR's behest and not the other way around. See supra at 13. The conspiracy to induce breach of contract claim should therefore be dismissed.

**B.    The SAC Fails To State A Claim For Unjust Enrichment Against Barclays (Count V)**

The unjust enrichment claim against Barclays fails because (1) the existence of the Master Agreement precludes such claim, and (2) Lehman fails to allege, as it must, that Barclays had any dealings with LBSF regarding this swap or even knew that LCOR, the only party with which Barclays dealt, breached any contractual payment obligation to LBSF.

**1.    The Master Agreement Precludes Recovery From Barclays**

"[A] valid and enforceable contract precludes an unjust enrichment claim relating to the subject matter of the contract." Morgan Stanley & Co., Inc. v. Peak Ridge Master SPC Ltd., 930 F. Supp. 2d 532, 545 (S.D.N.Y. 2013). "This is true whether the contract is one between parties to the lawsuit, or where one party to the lawsuit is not a party to the contract." Id. at 546. Thus, an unjust enrichment claim against a nonparty to the contract necessarily fails when it is "based on whether a sale to such third party conformed to the requirements of the contract." Id. In Morgan Stanley, Peak Ridge alleged that, following its default under its

---

[17]    The Court may take judicial notice of the fact that swaps dealers like Barclays provide quotes to market participants on a daily basis in the ordinary course of business. The SAC does not allege that the quote provided by Barclays was inaccurate, nor does the SAC contain any factual allegations that Barclays inquired of LCOR or knew why it was seeking the quote. The mere provision of an ordinary course, factually accurate quote to LCOR cannot sustain any claim against Barclays that it induced LCOR to breach the Master Agreement with LBSF. Cf. Cumis Ins. Soc., Inc. v. E. F. Hutton & Co., 457 F. Supp. 1380, 1387 (S.D.N.Y. 1978) (dismissing claim that broker aided and abetted securities fraud by extending ordinary-course loan without investigating its client's purpose for entering into the transaction).

customer agreement with Morgan Stanley, Morgan Stanley liquidated the securities in Peak

Ridge's account in a commercially unreasonable manner by selling positions to MSCG (its

affiliate) in a non-arm's length transaction that allowed MSCG to book a gain purportedly at

Peak Ridge's expense.  Id.  The court found these allegations sufficient to state a claim for

breach of contract against Morgan Stanley, but dismissed the unjust enrichment claim against

MSCG because:

> While the Customer Agreement does not set forth Peak Ridge's
> rights vis-à-vis MSCG, it directly covers the same subject matter
> Peak Ridge alleges as the basis for its unjust enrichment claim—
> the sale of the account by Morgan Stanley to MSCG was not done
> in a commercially reasonable manner through an arms-length
> transaction.  Therefore, Peak Ridge has a remedy at law through a
> breach of contract claim, which necessarily extinguishes recovery
> for the same underlying conduct through a quasi-contract claim. . .
> . Although MSCG may have benefited from the sale of the
> account, that alone is not enough, particularly where MSCG
> assumed no obligation to ensure the sale was fair to Peak Ridge.

Id. at 546-47 (citations omitted).

Like MSCG in Morgan Stanley, the SAC alleges that Barclays "benefited" by

failing to pay LCOR a commercially reasonable amount to enter into a replacement swap.  See

SAC ¶ 64 ("By stepping into LBSF's shoes at such an off-market price, Barclays realized an

immediate and substantial windfall, effectively redirecting that economic gain from LBSF to

itself.").  But, as in Morgan Stanley, the Master Agreement between LBSF and LCOR "directly

covers the same subject matter," i.e., that the replacement swap "was not done in a commercially

reasonable manner."  930 F. Supp. 2d at 546.  See SAC ¶ 108 ("By . . . failing to use reasonable

valuation practices, LCOR breached the Master Agreement.").  Thus, just as Peak Ridge had a

remedy at law through a breach of contract claim against Morgan Stanley, Lehman has a remedy

at law through a breach of contract claim against LCOR.  See Morgan Stanley, 930 F. Supp. 2d

at 546.  The Master Agreement, therefore, "extinguishes" the unjust enrichment claim based on

Barclays' allegedly inadequate upfront payment to LCOR, particularly because Barclays "assumed no obligation to ensure" the replacement swap was fair to Lehman.  Id. at 547.

Nor do the SAC's remaining allegations against Barclays – that it made the upfront payment at LCOR's direction to the PTO Holdings account and provided a quote for an interest rate cap, again at LCOR's request – support an unjust enrichment claim.  In contrast, in Raymond James, Lehman alleged two critical facts that it does not and cannot allege here:  (1) that Raymond James allegedly directed Iowa Telecom's unreasonable closeout with LBSF, and (2) that Iowa Telecom invoked its reliance on Raymond James' advice as a defense to LBSF's breach of contract claim against it.[18]  Iowa Telecom thus had a plausible argument that its reliance on Raymond James's advice rendered its closeout, even if commercially unreasonable, in good faith and not in breach of its contract with LBSF.  Id. at 20:14-21:5.  In that circumstance, Raymond James's conduct would have had the effect of depriving LBSF of its contractual entitlement to a commercially reasonable termination amount and for that reason, this Court determined that Raymond James' "efforts or conduct . . . working with and advising" Iowa Telecom were not within the subject matter of, and thus not precluded by, the ISDA master agreement between Iowa Telecom and LBSF.  See Raymond James at 4-5 (citing Hildene Cap. Mgmt., LLC v. Freidman, Billings, Ramsey Grp., No. 11 Civ. 5832 (AJN), 2012 WL 3542196, at *11 (S.D.N.Y. Aug. 15, 2012), and Howe v. Bank of New York Mellon, 783 F. Supp. 2d 466, 485-86 (S.D.N.Y. 2011)).[19]

---

[18]     Tr. of H'rg on Feb. 26, 2015 at 19:5-20:5, 26:17-27:6, 36:2-10 Lehman Brothers Holdings Inc. v. Raymond James Financial, Inc. (In re Lehman Bros. Holdings Inc.), Adv. Proc. No. 14-02243 (SCC), attached as Ex. J.

[19]     In Hildene, the court explicitly acknowledged the general principle that a valid contract precludes unjust enrichment claims based on its subject matter, even as against third parties, but allowed an unjust enrichment claim to proceed against a non-contractual party alongside a breach of contract claim against the contract counterparty because there were plausible allegations that the conduct of the non-contract party was not covered by the contract. See id. at *10 ("[I]t does not appear that the indentures contemplated that a purchaser would offer side payments to induce the Preferred Shareholders to sell Portfolio Collateral.  Indeed, Wells Fargo and FBR's argument in response to Hildene's breach of contract claim on this point is that there is no provision of the indentures addressing such side

Here, by contrast, the SAC alleges that LCOR and its other advisors (not including Barclays) were responsible for the manner in which LCOR closed out with LBSF, and LCOR does not claim any reliance on Barclays as a defense to Lehman's breach of contract claim against it.   Moreover, Lehman pleads that Barclays' involvement in LCOR's alleged breach in making the upfront payment at LCOR's direction to the PTO Holdings account and providing LCOR with the interest-rate-cap quote it requested, constituted breaches of the Master Agreement *by LCOR*.  See SAC ¶ 97 ("LCOR contrived its Loss calculation to result in a receivable by claiming approximately $5.7 million for the theoretical cost of entering into an interest rate cap. . . . It is *improper under the express terms of the Master Agreement . . .* to include costs that were never incurred in a Loss calculation." (emphasis added)); id. ¶ 65 (alleging LCOR breached Master Agreement by failing to pay LBSF the $15.6 million from Barclays and instead holding it in the PTO Holdings account).  Accordingly, everything Barclays is alleged to have done that supposedly gives rise to a claim of unjust enrichment is squarely "within the subject matter" of the Master Agreement.

### 2.    Barclays' Lack of Direct Dealings With LBSF Or Knowledge of LCOR's Closeout Terms Also Necessitates Dismissal

In addition, although LBSF "need not be in privity with [Barclays] to state a claim for unjust enrichment," where, as here, LBSF and Barclays "simply had no dealings with each other, their relationship is too attenuated" to support an unjust enrichment claim.  In re LIBOR-Based Fin. Instruments Antitrust Litig., 935 F. Supp. 2d 666, 737 (S.D.N.Y. 2013) (relationship between purchasers of LIBOR-tied futures contracts and banks whose only connection to

---

payments."). See also id. at *6. Similarly, in Howe, the court allowed an unjust enrichment claim to go forward based on conduct of a third party alleged to be outside of the scope of the agreement. 783 F. Supp. 2d at 485-86. Here, the conduct the SAC alleges as to Barclays – that it provided an interest-rate-cap quote and complied with the direction to make payment to PTO Holdings – are within the subject matter of the LCOR-LBSF Master Agreement as Lehman specifically pleads that LCOR's use of the interest-rate-cap quote and holding funds in the PTO Holdings account rather than pay them to LBSF constituted breaches of the Master Agreement by LCOR.

purchasers was that they allegedly manipulated LIBOR was "surely too attenuated to support an unjust enrichment claim").

As an example of a relationship too attenuated to support an unjust enrichment claim, the New York Court of Appeals has held that where the defendant had no knowledge that the plaintiff's counterparty breached its contract with the plaintiff, the plaintiff cannot state a claim for unjust enrichment.  In Georgia Malone & Co. v. Rieder, 19 N.Y.3d 511 (2012), the plaintiff broker alleged it provided due diligence materials to its client for which its client, a real estate developer, failed to pay plaintiff, and also alleged that such developer shared those materials with a rival broker who then earned a commission on the project allegedly with the benefit of the plaintiff's materials.  Id. at 514-15.  The complaint specifically alleged, and the court accepted, that the rival broker was aware that the plaintiff had prepared the diligence materials.  Id. at 517.  Even so, the court held that the plaintiff's unjust enrichment claim against the rival broker was properly dismissed because there was no allegation that the defendant knew the developer had failed to pay plaintiff for the materials, and "the pleadings do not implicate [defendant] in [the developer's] alleged wrongdoing."  Id. at 517-18.  In other words, it is not enough to allege that the defendant knew it was dealing with a party that in turn had dealt with the plaintiff; rather, the complaint must allege that the defendant knew the party in the middle had failed to pay the plaintiff what it was owed.  Here, there are simply no factual allegations that Barclays knew the contents of LCOR's calculation statement.  The unjust enrichment claim therefore should be dismissed.

## CONCLUSION

For the foregoing reasons, this Court should grant Barclays' motion and dismiss the SAC as against Barclays with prejudice.

25

Dated:  September 28, 2015
        New York, New York

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP


By:   /s/ Thomas J. Moloney
      Thomas J. Moloney
      Boaz S. Morag
      Mark E. McDonald

One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for Barclays Bank PLC and Barclays
Capital Inc.